Docket No. 98911.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
TEODORO BAEZ, Appellant.

*Opinion filed February 25, 2011.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion.

Justice Theis took no part in the decision.

## OPINION

Defendant Teodoro Baez pleaded guilty to the murders of Juan Estrada and Janet Mena. The circuit court of Cook County found defendant eligible for the death penalty and, after weighing the evidence in aggravation and mitigation, sentenced defendant to death. On October 18, 2005, this court remanded the cause to allow defendant to file a late motion to withdraw his guilty plea. After an evidentiary hearing, the circuit court denied defendant's motion. His appeal lies directly to this court under Supreme Court Rule 603 (Ill. S. Ct. R. 603 (eff. Oct. 1, 2010)). For the reasons set forth below, we affirm his sentence.

BACKGROUND

The following background facts are drawn from the stipulated testimony in support of the factual basis for defendant's plea of guilty. On August 6, 1999, the body of Juan Estrada was discovered in a grassy area at 3542 West Carroll Street in Chicago. Estrada's legs were missing. On August 9, 1999, a human leg was recovered from the Chicago River at West North Avenue. Another leg was found shortly thereafter, and a left arm was also found nearby. The legs were later matched to Estrada, and the arm was later matched to Janet Mena. On August 10, 1999, Mena's body was discovered in a vacant lot in at 1810 West Walnut in Chicago. The head and left arm had been severed and removed, but the head was found at the same location as the body. Mena's car was found parked near a restaurant in Berwyn on August 11, and Estrada's car was found at 3720 West Berteau in Chicago on August 12. Estrada's car had been ticketed at that location on August 10.

Dr. Joseph Lawrence Cogan, an assistant medical examiner, testified that he performed a postmortem examination of Juan Estrada. According to Cogan, the amputation of Estrada's legs appeared to be postmortem. Estrada's left shoulder had also been partially amputated. Cogan also found 24 incised wounds on Estrada's body. He explained that incised wounds are elongated cuts created when a sharp instrument is drawn along the cut surface. Sixteen of the incised wounds were on Estrada's head, while the others were concentrated in the arms. Cogan described the arm wounds as "defense-type wounds." Cogan also found 14 stab wounds, which differ from incised wounds in that they are "penetrating." The stab wounds were on various parts of Estrada's torso, chest, and back. Estrada had also been shot twice, once in the right chest and once in the right back. Cogan opined that the cause of death was multiple injuries due to an assault.

Cogan also performed a postmortem on Janet Mena. Parts of Mena's body were "very decomposed." In particular, Cogan described Mena's head as "half skeletonized" and not "recognizable visually." A skull fracture on Mena's left side corresponded to a cut over her left ear, and Cogan opined that this was "some kind of a blow or chop injury with a sharp instrument." He also found evidence of a blunt force trauma to the left side of the head and possible evidence of

-2-

strangulation. On Mena's body, Cogan found four stab wounds to the back, along with several smaller cuts that he associated with the amputation of the head and arm. He also identified a wound in the posterior vaginal area that was associated with increased insect activity. Cogan noted that this increased activity suggested the presence of bleeding, which would indicate that Mena was still alive when the wound was inflicted. He also noted, however, that the wound itself gave no indication of whether it had been inflicted before or after death.

Defendant's Statement

Defendant was interviewed on January 30, 2000, at Area 4 Headquarters in Chicago. The videotape of this interview was admitted into evidence at defendant's guilty plea and at his sentencing hearing. The tape includes defendant's waiver of his right to counsel and his right to remain silent, including full *Miranda* warnings.

Defendant stated that he had arranged to meet Juan Estrada at around midnight on August 5, 1999, to buy heroin. Defendant met Estrada at a gas station near defendant's home, and directed Estrada to drive to defendant's home. Defendant had never seen Estrada's female passenger, Janet Mena, before. When they arrived at defendant's apartment building, Estrada and defendant went up to defendant's apartment while Mena waited in the car.

Once in defendant's apartment, defendant tried to give Estrada money for heroin. However, Estrada refused to accept the money because defendant owed him approximately $1,000. According to defendant, Estrada became "hostile," calling defendant "bitch, asshole and punk." Defendant began to feel "discomfort" because defendant "didn't understand why he would not cooperate." Defendant also said that he felt "threatened by his words and his hostile body language," which defendant said consisted of "tightening or tensing up of the muscles" and "waving of the arms." However, defendant acknowledged that Estrada did not have any weapons on him, and that Estrada had done nothing threatening other than lifting his arms and yelling.

Defendant described what happened next: "At first I tried to negotiate with him and then when I felt negotiation was not possible,

I reacted in a truly hostile manner and retrieved a small revolver, small caliber revolver from my waistband and shot Juan Estrada a couple of times." Defendant could not remember how many times he had shot Estrada, but he said that Estrada began to scream. Defendant told him to "shut up and be quiet." When defendant "felt that the gun was no longer useful," defendant took one of his swords down from the china cabinet in his apartment. Defendant explained, "I was in a fit of rage and I was, I was paranoid that the gun was making too much noise and I had chose [*sic*] to kill Mr. Estrada." When asked why he had decided to kill Estrada, defendant replied, "After I had shot him, I figured I was gonna die if I allowed him to live anyway because I was aware of his squad *** and I did not want him to send them after me."

Defendant stated that when he grabbed the sword, he intended to "[t]ake the life from Mr. Estrada," and he began "hacking and stabbing" Estrada "numerous times." "So many times," defendant claimed, "that I can't even count." While defendant was "chopping away at Juan Estrada," Estrada asked defendant why he was doing it. Defendant told Estrada it was "because he was trying to turn some members of our organization against me." According to defendant, Estrada was still standing when defendant began striking him with the sword, but he eventually fell to his knees, and defendant kicked him down onto the floor. When defendant believed Estrada was dead, he stopped stabbing him and began to wipe up Estrada's blood with some towels. Defendant told investigators that Estrada looked "gory," with "many slashes" to his head and hands and "stab wounds to his body." When asked why he had slashes on his hands, defendant explained that Estrada had tried to defend himself from the sword with his hands.

Once defendant had wiped up the blood around Estrada's body, he made himself "look presentable." He then went downstairs so that he could "coerce the female into coming into the apartment," because he was afraid that "she would be a witness to the last known place" of Estrada. He told Mena that Estrada "was gonna be awhile, would she like to come up," and she agreed. After defendant allowed Mena to use his bathroom, he asked her if she wanted a drink. Defendant explained that he "cunningly closed the door to keep her from observing Mr. Estrada's death." She accepted his offer of a drink, and

-4-

when she turned her back defendant began to strangle her. Defendant told investigators that he "choked her until she was semi-conscious" and defendant "thought she was unable to defend for herself." He said that he tried to choke her "until she was dead"–at least three minutes–during which time "[s]he was saying her final prayers. She was asking for the Lord or Jesus in small moans and grunts." Defendant described what happened next: "And after *** I had got done choking her, I stood above her and seen that she was still squirming for air so I began to kick her around her upper vertebras of her spinal cord to induce death."

After kicking her neck, defendant dragged Mena into the bathroom. He then went back to Estrada and dragged him into the bathroom as well. He placed Estrada's body in the bathtub and began to run the water, "so that the blood could flush down the faucet." Mena, however, was still alive and had "turned her attention away from God and was then calling for Juan." Defendant picked Mena up and "threw her in the tub" on top of Estrada's body. According to defendant, Mena "still had some life in her." He then "stabbed her a couple of time hoping that her blood would also drain down the tub." "After a while," defendant took Mena out of the tub and stripped her naked. He then placed her head in the toilet and stabbed "her brain stem," flushing the toilet to allow "excess blood" to "drain down the toilet bowl."

Once he believed both victims were dead, defendant decided to "remove both victims' heads." Defendant stated that his intention was to dismember the bodies so that he could remove them from his apartment "in a manner which would not alert public eye attention." He began to "chop at" Mena's head with the sword, but "gave up before the task was done." He then turned to her arm. "When I got to the bone," defendant stated, "it was hard to break the bone so I left both of the victims in the restroom and searched for a different weapon and came back with a hacksaw and I sawed her off." He put Mena's arm into a garbage bag. He then loaded Mena's body into another garbage bag and placed that bag into a garbage can, which he put in his trunk. Defendant got into the car and drove around Chicago until he found a "suitable" place to dump the body at the corner of "Wood and Carroll Street." He took the bag containing Mena's body out and left it in the lot, and then he took the garbage can back to his

apartment.

Back at his apartment, defendant got out a battery powered electric saw to dismember Estrada. Defendant said that he "chopped away" at Estrada's neck and right arm, but decided not to remove them. Instead, he decided to remove Estrada's legs, and he accomplished this using the hacksaw and the electric saw. He then put Estrada's body into the garbage can and covered his head with a garbage bag. Defendant loaded the garbage can into his car and found a place to dump Estrada's body near "Carroll Street and Sacramento."

Defendant then returned to his apartment and retrieved the limbs he had removed from the bodies, as well as "some other bags full of soiled articles." He took the bags to the Chicago River and tossed the limbs in one at a time. He then drove around dumping the other bags. Defendant then went back to the apartment again and retrieved Estrada's jewelry and the weapons, except the swords. These items, too, defendant discarded around town. With respect to the swords, defendant said, "I couldn't just throw them away because they're noticeable objects in the house cause they were decoration. And to just get rid of them all of a sudden would arouse suspicion." Instead, defendant's girlfriend took the swords to her cousin's house.

Pretrial Proceedings

Defendant's first claim of error on appeal relates to certain proceedings that occurred before any evidence was taken in this case. We review the relevant pretrial proceedings.

On March 16, 2000, defendant appeared in court accompanied by Charles Buchholz, an assistant public defender with the office's murder task force. On May 24, 2000, defendant appeared again, and the court indicated that defendant had mailed two letters directly to the court. The first letter was addressed to the court and requested the court's help in getting defendant into protective custody because he did not feel safe in the jail. Buchholz, again appearing with defendant, indicated that he had "taken care of that matter." The second letter was a copy of a letter defendant had sent to the Attorney Registration and Disciplinary Commission (ARDC) regarding Buchholz. When asked about the letter, defendant stated that he wanted to file a "motion for appointment of counsel other than a public defender."

The court indicated that defendant's letter appeared to be "basically" such a motion. The letter raised several complaints, and the court addressed each one in turn.

Defendant's complaint first alleged that Buchholz was not "truly versed in the law," because Buchholz had refused to file a "motion to arrest judgment" at defendant's request although a law librarian at the jail had told defendant such a motion was possible. Defendant's letter also complained that Buchholz had sent another attorney to court with defendant rather than appear himself, and no attorney had been to visit his loved ones. The court explained to defendant that there is no such thing as a "motion to arrest judgment." The court also explained that it is common for attorneys to appear on each other's behalf for some court appearances. Finally, the court told defendant that his attorneys were not required to visit his loved ones, but that they could make appointments to talk with the attorneys.

Defendant also alleged in his letter that Buchholz had threatened to kill him. According to the letter, defendant had complained to Buchholz that "some powerful Columbian drug lords and the Satan Disciple organization" had offered money to anyone who would kill defendant. Defendant claimed that Buchholz had asked how much was being offered, and then said, "We'll kill you if they are paying enough!" Defendant wrote that he was "astonished" and "could no longer trust" Buchholz. In court, Buchholz said that the ARDC had asked Buchholz to respond to defendant's allegation and he had done so. Buchholz also informed the court that the ARDC had indicated no further action would be taken. Defendant's letter to the ARDC also repeated the concerns about defendant's safety that he had raised in his letter to the court.

After reviewing the complaints raised in the letter, the following discussion occurred:

> "THE COURT: Is there any other complaint that you would like to lodge against your attorney?
>
> DEFENDANT: I just don't feel comfortable with Mr. Buchholz, and I prepared a formal written motion, but I guess we have taken care of that, verbally.
>
> THE COURT: All right. Well, everything that you have just–what you allege in here are things that are not the basis

of having another attorney. And, Mr. Baez, you have a right to an attorney, but not an attorney of your choosing. *** When you are appointed an attorney, and charged with murder, you are appointed someone who has worked on many murder cases on many occasions.

* * *

If Mr. Buchholz is not doing his job, then that is one thing. You can, certainly, bring that to my attention.

***

And as I said, Mr. Baez, if there is something, some other issue, other than the issues that I just put on the record, you can, certainly, share that with me.

DEFENDANT: No, ma'am, and I don't mean to turn your courtroom into a mockery or anything.

THE COURT: All right. Mr. Baez, it is just lack of knowledge. I am not holding that against you."

On July 6, 2000, just over one month after the above discussion, defendant appeared in court again, represented by Buchholz. However, at defendant's next appearance on August 31, 2000, private attorney Jeffrey Granich sought leave to file an appearance. The court granted Granich's request. On September 20, 2000, Granich appeared along with Buchholz, who requested leave to withdraw. The court allowed Buchholz to withdraw. Between September 2000 and April 2001, Granich appeared on defendant's behalf four times. During one of these appearances, Granich requested a sanity evaluation; no other substantive matters occurred on the record in this time.

On April 2, 2001, the State filed its notice of intent to seek the death penalty. During the same appearance, Granich indicated that he was filing a motion for appointment of counsel for defendant under the Capital Crimes Litigation Act.[1] The motion was continued to allow the State time to respond, and on April 19, 2001, the State declined to take a position on the motion. The following discussion

---

[1]The circuit court later indicated that the motion was not received by the court on April 2; it is not clear when the motion was actually filed and received.

then occurred:

"THE COURT: All right. Counsel, I don't know the procedure to go through other than to say that you are appointed. But that is fine with me. You will be appointed and paid through the county through a special fund.

GRANICH: I also asked in my motion that a trial partner of mine that the Court is aware of, John Theis, also be appointed with my office to work on this case.

What is actually going to happen, Judge, is I am taking this as of June 1st. John has agreed to come in on this case and would take over the litigation of this case until I return. I am going on vacation.

THE COURT: All right. Now, I don't know if capital litigation will appoint two private lawyers. I am not sure. I am not familiar enough with it. Certainly at this time I will appoint you as trial counsel. Has the attorney filed a motion?

GRANICH: We discussed this case at great length. I informed him that I was going to be filing this motion. He asked to be included in it. I did include him in the motion.

Judge, I think there was some–In the motion I filed some statutory authority. I believe that there is some comment that for a death penalty case two lawyers should be appointed.

THE COURT: Well, there certainly is language that the defendant should have two lawyers. The public defender, they would appoint two lawyers. Private counsel I am not certain. I will appoint you today and then you can raise the issue.

GRANICH: It sounds great."

On May 9, Granich appeared along with John Theis. The court indicated that it had not yet reviewed the relevant statutes but would do so before the next court date. The following dialogue ensued:

"GRANICH: Can I suggest May 22nd? That's a short date. The only reason I'm asking, Judge, I plan on leaving as of May 25th. That's why I was seeking to have Mr. Theis brought in on this case as well.

THE COURT: Are you saying you won't even do the case?

GRANICH: I anticipate returning and trying this case when necessary, Judge, but, what I had anticipated was Mr. Theis would carry on the case while I was out of town and then I would be returning to try the case.

THE COURT: You need to put something in writing for me, Counsel, when you'll be gone, because we'll have substitute counsel rather than two attorneys on this case.

GRANICH: All right.

THE COURT: *** I need it in writing what you intend to do, when you intend to leave. If you can get that to the State by the 16th, I can review it.

* * *

The statute says–Supreme Court rules talk about a certain number of attorneys. I don't know that it speaks to the county paying for two and maybe a private attorney and a Public Defender."

The case was continued to May 22, 2001. On that date, the court reviewed the history of the case on the record and then indicated that it had discussed the appointment of Theis with the parties in chambers:

"I informed Mr. Granich and the state's attorney in my chambers that I don't think that this is something that legally I can do because there is really no basis for appointing private counsel on Mr. Baez's case.

Counsel represented to me I think a month or two ago that Mr. Baez paid him less than five thousand dollars on a capital murder case. On a capital murder case I cannot imagine counsel being able to proceed on the case with *** less than 50 thousand dollars, and because of that it is clear if Mr. Baez can't pay more than five thousand dollars that he cannot afford private counsel.

I cannot give him private counsel just because he wants private counsel. There has to be a reason for appointment. There are excellent attorneys in the public defenders murder task force and one of those attorneys will be appointed to represent Mr. Baez.

If this were a case that were near trial and everybody was ready then I could see kind of stepping in and completing it, but we're at the beginning of this case and in actuality murder cases, especially death penalty cases, are not disposed of in less than two years that I've ever seen, so I cannot see any justification for the appointment of private counsel.

I would not only require the county to pay for the representation of two lawyers but possibly for an investigator, mitigation specialists, all those people that the public defender has on their staff, at least the investigator, and all of the personnel that work for them.

So I am going to withdraw the appointment–vacate my appointment I guess of Mr. Granich and reappoint the public defenders, the murder task force on Mr. Baez's case."

Granich objected, and the following discussion occurred:

"GRANICH: Judge, just for the record, I do believe that there is authority for private counsel to be appointed in the motion that I filed that the court originally granted. I cited instances where courts in Illinois have appointed people using the Capital Crimes Litigation Funds Act and also the Capital Crime Litigation funds to pay for mitigation specialists, experts and private counsel.

Based on the Court's ruling today I presume I would be seeking leave to withdraw my appearance over my objection.

THE COURT: Certainly, counsel. But the fact of the matter is in those cases there was some justification for it. The only particular case that I'm really aware of when it's at the eve of trial when private counsel has been appointed. I've never seen a private attorney appointed at the beginning of a case when the family obviously cannot afford private counsel. Now he cannot afford private counsel. It's just that simple. And the county cannot afford to give people private counsel just because they want it. All the money in the capital litigation funds would be gone in six months if I appointed everybody who wanted a private lawyer to have it in their case, and the fact is that there are excellent attorneys in the murder task force and with all deference to you and Mr. Theis

-11-

both of whom I respect and admire, all lawyers in the murder task force probably have two or three times the experience that you gentlemen have in death penalty cases, and so it's just no justification for it.

All right, the public defenders murder task force will be appointed and private counsel's appointment is vacated."

The court also noted defendant's previous complaints about Assistant Public Defender Buchholz, and the court directed Assistant Public Defender Stu Smith, who was present in the courtroom, to ask that Buchholz not be reassigned to the case. The court then addressed defendant directly, telling him that he would be given time while the public defender assigned new counsel. The following colloquy then took place:

"DEFENDANT: May I plead guilty to this case? I'd like to change my plea.

THE COURT: Well Mr. Baez, let me tell you this. You have the absolute right to plead guilty. However, I think you need to first talk to an attorney. I think you said this to me before.

DEFENDANT: No. I been deciding this since the incident occurred.

THE COURT: I don't want you to talk about the facts of the case at all, Mr. Baez. I'm almost certain that you made a statement similar to this in court before. But let me say this to you. When you get another attorney on the case you talk to that attorney about your desires, your options. Wait until the attorney gets all the reports on this case and they have an opportunity to review those reports and to talk to you about the strength or weaknesses of the case. And if you want to plead guilty then you tell the lawyer that that's your desire. That lawyer can talk to you. They can talk to the State. They can possibly get a resolution of your case. I don't know.

They may involve me in the resolution of your case. I don't know. I can't get involved in it unless both parties agree. Do you understand what I'm saying?

DEFENDANT: Yes, ma'am.

THE COURT: So just wait until you have an opportunity

-12-

to talk to the lawyer. Actually there will be two lawyers I'm sure who will be appointed on the case from murder task force. Talk to them. But give them an opportunity to get all the evidence and review it so they can have an intelligent conversation with you to let you know what your options are and what they will think is best for you. Listen to what they say, sir?

DEFENDANT: Yes, ma'am.

THE COURT: Of course it's ultimately your decision. And only your decision. All right. I'm going to give it a two week date?

DEFENDANT: No, Friday please.

THE COURT: Okay. Counsel.

[Assistant Public Defender] SMITH: Judge, may I address the Court on two matters. One is in addition to all the matters that the Court pointed out here, factors the court considered, I'm also aware counsel indicated to me and may have indicated in a written motion Mr. Granich is going to be out of the country for at least six months and I believe that is going to be soon.

GRANICH: At this time, Judge, I'm not sure how long I will be gone.

THE COURT: I know Mr. Granich on the last two court dates he has been in front of me he represented he's going to be gone some period of time. I asked him to tell me in writing how long. As of this moment he hasn't I think said how long but he did say he thought months when we had the conversation.

GRANICH: That is correct.

THE COURT: That's really not the major issue. It's whether or not I can appoint private counsel when in effect counsel has not been hired. Because five thousand dollars is not hiring an attorney in a death penalty case."

The case was then continued to June 12, 2001, when Buchholz appeared with defendant. The parties indicated that all discovery was complete except for certain information relating to the factors in

-13-

aggravation. Buchholz informed the court that he was still in the process of obtaining some of the files from the attorney who was "taking over Mr. Granich's practice," and the case was continued to July 11. On that date, the parties again agreed to continue the case for additional discovery and pretrial motions. Buchholz, who again appeared, requested September 25, indicating that he intended to be on vacation "most of September."

On September 25, 2001, defendant again appeared with Buchholz. Before other business was conducted, the court asked defendant what he wanted done with a letter he had sent to the court. That letter does not appear in the record. The following discussion occurred:

> "THE COURT: *** I want to know if you want me to tear it up or give it to your lawyer or what?
>
> DEFENDANT: I was, I was asking the Court if I can proceed pro se?
>
> THE COURT: I thought we had this discussion before?
>
> DEFENDANT: No, we had a discussion about me receiving a new lawyer, and that ended in a no.
>
> And then I tried to obtain my own lawyer, and we're all familiar with the outcome of that, and I'd like to proceed pro se.
>
> THE COURT: You certainly have the right to proceed pro se, Mr. Baez, if you want to do so. I wouldn't suggest it. But you certainly have the right to do so.
>
> Have you been communicating with Mr. Buchholz?"

Defendant responded that he had not seen Buchholz since before the last court date in July. Buchholz explained that he had been trapped out of the country by the events of September 11, 2001, but that he and defendant had "communicated." The court then addressed defendant's request:

> "THE COURT: I know you talked to him. I wanted to put it on the record.
>
> Let me say this, Mr. Baez. I certainly think that it would be completely unwise for you to try to represent yourself. I read the, just the first paragraph of your letter that you sent to me.

* * *

Let me–just from reading the first paragraph, let me explain that what you're saying in here, you want Mr. Buchholz [*sic*] to have a serious conversation on your behalf.

He has to have everything, every single piece of discovery that the State has, and they just filed a supplemental answer to discovery today and what we call an answer to discovery, that has additional material. Behind these pieces of paper may be volumes of sheets of paper. He has to get all of the materials that the State has.

There's also what's called mitigation evidence, which means evidence that would be to your benefit. Possibly witnesses, things about your background. Of course, I know nothing about you at all. Your schooling, those kind of things.

* * *

First he needs that, then he has to get the information from you that you have before he has a discussion with them, with the State.

DEFENDANT: He told me that he, because I already admitted to the crime–

THE COURT: Well, I have absolutely no idea, and he may be right. If he said that, I don't–because I don't know anything about that.

But before a lawyer can negotiate for you, this is a possible death penalty case. That is a possible disposition of the case. That's final, and you know that?

DEFENDANT: Yes, ma'am.

THE COURT: Before he can negotiate a disposition of your case, he needs to have everything in his power, everything good about you, certainly, to present to them, and anything that you can present that would help him negotiate for you.

I think you ought to give Mr. Buchholz an opportunity to review all his materials, to sit down with you[.]

* * *

He's a very thorough man, the state's attorney. He will

-15-

know everything about his case. Mr. Buchholz has to know everything about you before they can get together and try to negotiate.

DEFENDANT: I don't think anybody knows anything better pertaining to the case than I.

THE COURT: Well, you know, you may know more about what happened. But you don't know about the law, Mr. Baez. You don't know the negotiation process, because you have never been in this position.

DEFENDANT: Exactly.

THE COURT: All right.

So it's absolutely best for a lawyer to try to negotiate for you rather than try to negotiate yourself.

And, I mean, that is just the bottom line. You can do whatever you like. If you want to represent yourself, I'll give you all the admonishments that the law requires, and if you decide to represent yourself against my advice, I mean, that's what you will do.

But you will be at such a disadvantage, you will be at such a disadvantage if you are negotiating with the State on your own, you might tell them things Mr. Buchholz might not tell him. You might tell them things that would help them try the case against you rather than help you out.

He knows the things that are going to benefit you and he knows the things that are going to hurt you, because he knows the law and you don't.

So I would suggest that you let him proceed on your case.

* * *

He just knows so much more about it than you.

I'm saying that because I don't–I just think you'd be insane to try to represent yourself.

DEFENDANT: I feel that is the best thing for me.

THE COURT: All right.

We can do–would you do this for me? Before you make your decision, will you let Mr. Buchholz review the materials

he has, sit down with you one more time and talk about the case, talk about–if you still desire to do what you say in this first paragaph, and if you sit down with him and he will talk to the State before the next date, I'll give you a long enough date to have that conversation, and he can give you an answer from the State, whatever.

Once you have had that conversation, if you still want to get rid of your lawyer, I'll give you all your admonishments and then you will proceed on your own.

But once you make that decision, you will be on your own.

\* \* \*

You're in an unbelievably terrible position when you try to represent yourself. \*\*\* I would not possibly represent myself, even as a lawyer, and I have been a judge fourteen years, a lawyer for twenty-seven. I would not represent myself no matter what the charge was.

All right?

DEFENDANT: Yes, ma'am.

THE COURT: Mr. Buchholz, what I'd like you do is have a conversation with him, sit down at the jail before the next court date, and then sit down with Mr. Brogan."

Buchholz indicated that he would meet with defendant and that he had just hired a mitigation expert, and the court explained the role of the mitigation expert to defendant. The court noted that the mitigation expert would need time to compile her report, and then it turned back to defendant's request:

"[THE COURT:] So I think you ought to be a little more patient and realize that even though you think that representing yourself might be to your benefit, it may seal your fate.

All right?

DEFENDANT: Yes, ma'am."

At the end of this discussion, the court repeated its instruction to Buchholz to meet with defendant to discuss all of the discovery that had been tendered, and the parties agreed to continue the case to

-17-

November 13, 2001.

At the November 13 court appearance, Buchholz informed the court that he had met with defendant the previous week to review all of the "new discovery," including the videotape of defendant's interview with police. The court then addressed defendant, saying, "All right. You have got[ten] to talk to your attorney and see the videotape." The court did not ask defendant about his prior request to proceed *pro se*, but defendant replied, "And I agree to have counsel represent me."

Buchholz appeared with defendant once more in December 2001, but he left the public defender's office later that month. On December 28, the case was continued to allow new counsel to be assigned to defendant. On January 15, 2002, Assistant Public Defender Joseph Kennelly appeared with defendant. Kennelly represented defendant for the remainder of the proceedings in the circuit court.

Between January 15, 2002, and February 7, 2003, the case was continued several times. On March 5, 2003, a preliminary case management conference was held.[2] Defendant was represented by Kennelly, who indicated that the parties anticipated a plea. The court reviewed the discovery that had been tendered to that point, and then defendant interjected:

> "Ms. Lampkin, I can guarantee we are not going to trial. I have been talking with my lawyer. I think he keeps putting me off. I am sure that I am pleading guilty. I am trying to get him to plead me guilty. For some reason he said the State won't agree. I would like the State–Why don't they agree for me pleading guilty?"

The court reminded defendant that he was eligible for the death penalty and reiterated the importance of making sure his attorney had all available information before defendant entered a plea. Defendant responded, "I understand. But my whole point is I would like to get it over with as soon as possible." The court replied, "I can understand that, because it's been something that's hanging over you. You want

___

[2]The cover sheet on the report of proceedings for the preliminary case management conference erroneously lists the date as April 26, 2001. However, the corresponding docket entry is dated March 5, 2003.

to get it resolved," and defendant agreed, "Yes."

After inquiring again about how long it would take to finalize the discovery, the court stated, "All right. So that is what we will do. We will bring you back here in a week or ten days. Whenever both sides are ready, we will sit down. And, of course, Mr. Kennelly if he wants to plead guilty, it's his right. Of course, you know that. He just has to give you his best advice." Defendant replied, "He has been doing a great job of it."

Pretrial Proceedings

On June 27, 2003, defendant entered a plea of guilty to two counts of intentional murder. The court fully admonished defendant, who agreed that he was pleading freely and voluntarily. The court then inquired about defendant's representation:

> "THE COURT: Mr. Baez, you discussed this matter, your case with [Assistant Public Defender] Kennelly and [Assistant Public Defender] Farrell?
>
> DEFENDANT: Yes.
>
> THE COURT: They have visited you a number of times in the jail, sir?
>
> DEFENDANT: Yes, ma'am.
>
> THE COURT: Are you satisfied, sir, with their representation?
>
> DEFENDANT: Yes.
>
> THE COURT: Is there anything you want them to do that they have not done prior to you entering this plea of guilty, sir?
>
> DEFENDANT: No, they pretty much go do what I ask.
>
> THE COURT: I know every time you came into court you indicated that you wanted to plead guilty. But I wanted to assure myself there was no problem with Mr. Kennelly. I don't know Miss Farrell, but I know you've been with [Mr. Kennelly] for quite some time on the case. You're satisfied, then I'm certainly satisfied."

The State presented evidence in support of the factual basis for defendant's plea, which included defendant's videotaped statement.

The court found a factual basis and entered a finding of guilty of first degree murder with respect to each of the victims.

On August 20, 2003, the court found defendant eligible for the death penalty based on his convictions for intentional murder. The case then proceeded to the sentencing phase. Evidence in mitigation and aggravation was taken over several court dates between September 3, 2003, and February 27, 2004.

Evidence in Aggravation

In aggravation, the State resubmitted defendant's videotaped statement recounting the manner in which defendant committed these murders. Additional evidence in aggravation is described below.

*Defendant's Juvenile and Criminal Histories*

The State presented stipulated copies of defendant's prior felony convictions. In 1996, defendant was sentenced to two years for felony theft and seven years for armed robbery after pleading guilty on both charges. The theft occurred when defendant broke into a Dunkin Donuts where he had previously been employed and stole money from a locked office. In a separate incident, defendant and an accomplice returned to the same Dunkin Donuts store, and defendant threatened store employees and customers with a handgun. He then removed money from the cash register and cash box. Defendant was incarcerated on May 10, 1996, and paroled December 8, 1998. During his incarceration, defendant was disciplined four times for insolence and related behavioral charges. Defendant was also written up once for gang-related activity after he displayed a gang hand signal. None of these incidents involved any injuries, however, and defendant did not lose any good-behavior credit. Also in 1996, defendant was sentenced to two years in the Department of Corrections for unlawful use of a firearm by a felon. Defendant pleaded guilty to that charge after officers discovered that defendant was carrying a loaded revolver on a city bus. The underlying felony was a 1994 Michigan conviction for possession of a controlled substance.

The State also presented evidence of defendant's juvenile record in Michigan. That record includes at least 10 petitions filed between March 9, 1990, and September 24, 1993, alleging seven counts of

breaking and entering, six counts of unlawfully driving away a motor vehicle, one count of deserting his home without justification, and one count of retail fraud. All but one of the breaking and entering counts alleged that defendant broke into an auto body shop with the intent to commit larceny therein. Documents also showed that defendant had been terminated from a drug abuse treatment program for threatening a patient and a psychiatrist in 1990, and that he had left his group home several times without permission in 1992. Finally, a petition filed February 5, 1993, alleged that defendant had assaulted a victim with a weapon in an incident involving four other perpetrators.

*Defendant's Behavior in Custody*

On August 27, 2002, defendant was involved in an altercation in the Cook County jail. According to a witness, defendant approached fellow inmate Jon-Pierre Blackamore after a recreation period and stabbed him in the neck. The witness, a correction officer, then lost sight of defendant and Blackamore. After the incident, officers found a homemade knife made of sharpened metal, called a "shank," in the recreation area. Blackamore was stabbed twice in the chest and once in the neck, causing a collapsed lung, but he recovered. A statement made by defendant regarding the stabbing was excluded by the court.

The State also presented the testimony of Alan Mitchell, a correctional officer with the Cook County sheriff's department. Mitchell testified that on October 19, 2003, he was monitoring defendant and two other inmates in the "staging area" of the Cermak Health Center. Defendant and the others were all handcuffed and wearing leg shackles, but they were not shackled to one another. He explained that the staging area was adjacent to the emergency room, and it is where inmates wait to be seen by the doctors and nurses. Mitchell stated that when the other correctional officer left the staging area to investigate a disturbance in the emergency room, defendant and the other two inmates with him got up and tried to get into the emergency room from the staging area. Mitchell tried to stop them, and the two inmates with defendant started swinging at Mitchell, who fell to the ground. When he got back up, defendant approached him from the rear and struck him twice in the back of the head. Before the three inmates could leave, however, other correctional officers

-21-

returned and subdued them. Mitchell suffered a sprained ankle.

Officer Brent Lewandowski testified that he was stationed in the emergency room when an inmate who was being treated attacked a doctor. After officers had subdued that inmate, Lewandowski heard "a commotion" coming from the staging area, and he went in to find Mitchell "defending blows" from two inmates in front of him. Lewandowski testified that he saw defendant standing behind Mitchell and striking him in the head.

### *Victim Impact Statements*

Janet Mena's sister Gabriela Mena gave a victim impact statement, as did Mena's father and her mother. The court also heard impact statements by Kenneth Lozada, Juan Estrada's brother. Estrada's wife, Kimberle, who was 5½ months pregnant at the time of the murders, also submitted a statement.

### Evidence in Mitigation
### *Defendant's Childhood*

Defendant called his cousin, Tanya Potts, as a witness in mitigation. Potts testified that defendant lived with his mother, Lola, and siblings in a house near Potts in Grand Rapids, Michigan in 1983. In August 1983, Potts learned that defendant's family had been kidnapped by defendant's stepfather, Victor "Tutti" Pasarro, and the front door and front windows of the house had been broken in. Two or three weeks later, Potts and her father took defendant and his family to a women's shelter. Later, after defendant and his family moved back into their home in Grand Rapids, Pasarro moved in with them, and Potts was not allowed to visit the home anymore.

Approximately 10 years later, defendant's older sister Antoinette came to Potts' home and told Potts she had run away. She only stayed a few hours, however. Three or four months later, the father of Potts' children found defendant out walking in Grand Rapids and brought him to Potts' house. Defendant was dirty and tired, and he told Potts he could not go back home with his mother and Pasarro anymore. Defendant stayed with Potts and her family for two or three months, but he then left, telling her that he felt guilty that he could not contribute financially to the household.

Defendant's younger brother, Genarro Rosas, also testified. Genarro said that his first memory of Pasarro was when Genarro was approximately three years old, when they lived in Chicago. According to Genarro, his mother and Pasarro were fighting, and Genarro, Antoinette, and defendant were standing outside in the snow. Genarro recalled that he was in a diaper, and that Antoinette and defendant were in pajamas, and that Pasarro's sister had to come and take the children to their grandparents' house. Genarro also recalled an occasion where Pasarro and Delores were fighting and Pasarro threatened to kill Delores and Antoinette. It was after this fight that defendant, Antoinette, Genarro, and Delores moved to Grand Rapids.

Genarro then recounted the August 1993 kidnapping incident that Potts had described. According to Genarro, he and defendant had awoken in the night when they heard someone trying to break in. They heard a loud bang as the front door was broken in, and then they looked into the living room and saw Pasarro "throwing" their mother around. Genarro stated that Pasarro grabbed Delores by the hair and neck and forced her out to the car, where the children followed. Pasarro then instructed the children to get into the car, and he drove the family to an apartment in Chicago. According to Genarro, people in the apartment were "shooting cocaine or heroin, smoking crack or whatever, smoking weed, getting their high on." Genarro testified that he and his family spent two days in the back room of the apartment with no food or bathroom, until Pasarro's father discovered them and took the family to Delores's parents, who returned them to Grand Rapids.

Approximately eight months after they returned to Grand Rapids, Delores allowed Pasarro to move in. According to Genarro, Pasarro was abusive toward Delores "daily," and defendant, who was seven or eight, often tried to get between Pasarro and Delores. Genarro also testified that he and defendant were forced to kneel on bottle caps for 15 or 20 minutes at a time as discipline, and that Pasarro hit them with shoes and extension cords. Genarro also testified that Pasarro and Delores were still together, and that Delores was covered in bruises from years of abuse.

Genarro told the court that Pasarro did odd jobs for money, but that he also sold drugs. According to Genarro, Pasarro took Delores and her children with him to buy drugs from Pasarro's father, and

Pasarro's father also took the children with him to sell drugs to other people. Genarro also stated that he saw defendant take marijuana from "weed trays" in the house and smoke it as early as age 11. According to Genarro, Pasarro's family also gave the children alcohol to drink at family parties, and that defendant started drinking when he was approximately 12 years old. Genarro testified that defendant never really lived at home again after he started drinking. Instead, he would find cars to sleep in at night, and sometimes he would be found and arrested.

On cross-examination, Genarro acknowledged that he and Antoinette had both attended college and were working to support themselves. He also explained that he had never spoken to defendant about his crimes.

*Mitigation Specialist*

Defendant also presented the testimony of Mary DeSloover, an attorney with the public defender's office who prepared a social history of defendant. DeSloover presented several reports and evaluations performed by professionals defendant had seen. First, she testified that she received a report from the Dakotah Project, a family service treatment program to which defendant was referred in 1990 by his juvenile probation officer. The Dakotah report indicated that defendant had several pending legal problems, which it attributed to defendant's drug abuse. The report also indicated that drugs, including cocaine and marijuana, were being used in defendant's home by his mother's boyfriend. According to the report, which was created based on interviews with defendant and his mother, defendant's mother's boyfriend was abusive toward him. The report specifically indicated that slapping and hitting were used for punishment, and that defendant had spent most of one summer locked in his room for bad grades. The report also included some information about defendant's biological father. According to the report, defendant's mother claimed that she left defendant's father because he was "worshiping the devil." Defendant himself indicated that his father had discussed his father's belief in "devil worship" with defendant. Specifically, defendant's father told defendant that he had sold defendant's soul to the devil.

DeSloover also presented a "psychological assessment" by William J. Medick, a social worker, dated August 7, 1990. Medick reported that defendant, then 14, had been living on his own for one year. Medick found that defendant suffered from a depressive disorder, and that he was apprehensive and suffering from low self-esteem. Medick noted that defendant had engaged in "isolated external acts of anti-social behavior," but Medick believed those acts were "secondary to depression."

Next, DeSloover presented a report written by psychiatrist Raymond Buck at the Psychiatric Center of Michigan Hospital and dated August 13, 1990. Buck noted that defendant had suffered from periodic feelings of strong depression over a period of two to three years, including two suicide attempts in the four months before the evaluation. Buck diagnosed defendant with dysthymic disorder and recommended intensive inpatient treatment.

The next report was written by Dan Ziembroski, a social worker with the Psychiatric Center of Michigan Hospital. Ziembroski reported that defendant had been beaten by his mother's boyfriend, and that defendant was at risk for "developing real criminal status," for suicide, and for running away. Ziebroski recommended a treatment plan of long-term residential treatment that would include chemical dependence treatment and "dealing with issues of feelings of rejection by his parents."

Dr. Buck also prepared a discharge summary for the Psychiatric Center of Michigan Hospital, dated October 3, 1990. Buck summarized defendant's history of suicide attempts and his family history, noting that both defendant's biological father and his mother's boyfriend had been physically abusive toward defendant's mother. The report also noted that defendant had been prescribed psychotropic medication to control "his episodes of angry outbursts," during which defendant became "totally irrational" and "near psychotic."

DeSloover also reviewed a report dated May 1, 1990, and signed by several employees of the Michigan Juvenile Court System. The report indicated that defendant's mother had failed to appear for two counseling sessions, and she had not come to see or get defendant for Easter. The report recommended that defendant live with shelter care parents until long-term residential treatment could be arranged.

-25-

DeSloover also testified that she had interviewed defendant's mother, Delores Baez. Delores[3] was reluctant to talk to DeSloover, initially ignoring DeSloover's attempts to reach her by mail and through family members. Eventually, however, defendant's brother, Genarro Rosas, took DeSloover to meet with Delores, and he asked Delores to cooperate. DeSloover testified that Delores's boyfriend, Victor Pasarro, was present in her meetings with Delores, and that Delores appeared "nervous and afraid." During one meeting, however, Pasarro left the room for 5 to 10 minutes, and Delores told DeSloover that she and Pasarro had a "very bad relationship," and Pasarro did not want Delores to be involved in defendant's case.

DeSloover also presented a statement by Delores's sister, Kathy Baez. Kathy stated that Delores became pregnant with defendant's sister Antoinette at age 13 by defendant's biological father, Teodoro Rosas. Rosas was abusive towards Delores and her children. Kathy recalled that Delores's jaw had been broken by Rosas, and that defendant had needed stitches in his head because Rosas had thrown an ashtray at him. Kathy reported that when defendant and Antoinette heard Rosas arrive to pick them up from visits with their grandparents, they would shake, and Antoinette would sometimes vomit.

When Rosas went to prison, Kathy wrote, Delores cut ties with him, but she soon became involved with Victor Pasarro, whom Kathy claimed was also abusive. Kathy recalled her father helping Delores and the children move to Grand Rapids, and she recalled being told that Pasarro had kidnapped the family. Finally, she noted, Delores allowed Pasarro to move back in with her and the children, and Pasarro was physically abusive and controlling.

Kathy later moved to Grand Rapids, and she learned that defendant was running away from home and breaking into car dealerships to stay in them. Kathy allowed defendant to stay with her, and Delores and Pasarro would not allow defendant to have any of his clothes or belongings at Kathy's home. While defendant was staying there, he was attending school, and on one occasion Kathy threatened

---

[3]To avoid confusion, we will refer to Delores Baez, Kathy Baez, and Nancy Baez by their first names.

to return him to his mother's house if his grades did not improve. The next morning, defendant had run away, taking $2 for bus fare out of nearly $3,000 Kathy kept above the refrigerator.

Kathy wrote that the reason she was not attending court in person was that she feared gang retaliation against herself or other family members.

DeSloover also presented a statement written by Nancy Baez, another sister of Delores. Nancy wrote that when Delores became pregnant at 12½ years old, Delores and Rosas ran away to Mexico to live with Rosas's father. Rosas beat Delores, however, and his father bought Delores a bus ticket for her to return to Chicago. When she arrived, she was sick and dehydrated and required hospitalization. Soon after that, Antoinette was born prematurely.

Like Kathy, Nancy reported that Rosas was abusive toward Delores and the children. Nancy stated that her brother, Kimbow, often stood up to Rosas and threatened him to get him to stop abusing Delores and the children, but when Kimbow died in 1979 the abuse worsened.

When Rosas was incarcerated, Delores became involved with Pasarro. According to Nancy, Pasarro was very controlling. She also recounted the kidnapping incident. Nancy wrote that Pasarro continued to beat Delores and the children after he moved in with them in Grand Rapids. According to Nancy, Pasarro would lock the children in their rooms for weeks at a time during the summer. Nancy also stated that she was not appearing in court because she feared retaliation.

On cross-examination, DeSloover repeated her earlier testimony that Delores and Pasarro had been seeing each other for 13 or 14 years, and Genarro was 25 years old at the time of the hearing. She would not agree, however, that it was "impossible" for Genarro to remember standing in the snow with Pasarro at age three. DeSloover also testified that Delores did not have black eyes or bruises when DeSloover saw her, and that nobody except Genarro had reported that Pasarro made defendant kneel on bottlecaps. She also acknowledged that defendant's mother had appeared in court to ask for a reduction of defendant's bond, and she had assured the court that she could control defendant. The State also showed DeSloover a report written

by defendant's juvenile probation officer, who wrote that defendant's mother was "truly interested in the well-being of her son" and had "gone to extremes" to assist the officer.

The State then reviewed several of defendant's juvenile records with DeSloover, and she acknowledged that defendant had been disruptive and threatening on multiple occasions while in juvenile custody. One of defendant's evaluators had also written that there was an element of "cunning" to defendant's presentation, although he appeared to be cooperating. Defendant also told that evaluator that he found breaking and entering "fun" and had been excited during the crimes. In another of the reports, defendant reported that he fought with other kids at school for "fun."

*Testimony of Dr. Heinrich*

Dr. Larry Heinrich, a clinical psychologist, testified in mitigation. Heinrich reviewed the police investigative reports of the murders of Estrada and Mena, defendant's January 30, 2000, statement to police, defendant's juvenile and criminal arrest records, defendant's statement regarding the stabbing of Jon-Pierre Blackamore, and a social history report prepared by defendant's mitigation expert. Heinrich also spent at least six hours interviewing and testing defendant personally, and he administered two screening tests. The first measured defendant's level of literacy, which Heinrich concluded was at the high school level, indicating "at least average intelligence." Heinrich also administered the Millon Clinical Multiaxial Inventory III, which he described as a standardized psychological measure "to assist the clinical opinion."

Heinrich opined that defendant suffers from "a severe personality disorder which is called not otherwise specified because it has mixed features of the various other personality disorders." Specifically, Heinrich found features that were "avoidant, antisocial, sadistic, and negativistic." He explained that a defining characteristic of a personality disorder is that it is pervasive, rigid, and inflexible; he thus opined that defendant would have been influenced by the personality disorder at the time of the murders. Heinrich also agreed

that, as an axis II diagnosis,[4] the personality disorder constituted an "extreme mental disorder."

Defense counsel asked Heinrich whether anything in the reports of Forensic Clinical Services psychiatrists Drs. Rabin and Henry, and FCS psychologist Dr. Coleman, who had all evaluated defendant previously, supported his diagnosis. Heinrich noted that each of them had also diagnosed defendant with a personality disorder "not otherwise specified," but Henry and Coleman included an additional diagnosis of antisocial personality disorder. Heinrich also noted that other psychiatrists who had evaluated defendant had found features of a variety of personality disorders, including borderline personality, schizotypal personality, avoidant personality, and antisocial personality. According to Heinrich, these various diagnoses are all consistent with his evaluation of "not otherwise specified."

Referring specifically to Dr. Henry's report, Heinrich opined that a diagnosis of personality disorder not otherwise specified should not be made along with another personality disorder. According to Heinrich, "if a person does not fit" into a specific personality disorder,

> "the last personality disorder is called not otherwise specified, meaning that the individual has traits and features of all [or] some of the eight other personality disorders; so, therefore, if you have this personality disorder not otherwise specified you don't have another personality disorder. You can't have two of those because the [not otherwise specified] is to categorize features and traits of–of several personality disorders, and that's precisely what Mr. Baez has is a 'not otherwise specified' or 'mixed.' In other words, he has traits, features of several different personality disorders but nonetheless a

---

[4]The Diagnostic and Statistical Manual IV (DSM-IV-TR) separates patient assessment into five "axes." Broadly, axis I includes clinical disorders other than those covered by axis II, which includes personality disorders and mental retardation. Axes III, IV, and V cover general medical conditions, psychosocial and environmental problems, and global assessment of functioning, respectively. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 27-29 (4th ed. 2000).

-29-

severe personality disorder."

Heinrich noted that Dr. Coleman had diagnosed both antisocial personality disorder and personality disorder not otherwise specified. When asked about the use of both diagnoses together, Heinrich answered, "You can't do it. I mean, if you have antisocial then you don't put another–a personality disorder is one personality disorder so you have to make up your mind whether you have one of the first eight or the last one [not otherwise specified]. And they're putting in the last one which includes features and elements of all the ones prior to that."

Heinrich also opined that defendant did not suffer from antisocial personality disorder. According to Heinrich, while a person suffering from antisocial personality disorder displays behavior that is "calculated," "cunning," and "premeditated," defendant's behavior in this case was "impulsive," "confused," and "phobic." In particular, he opined that defendant had behaved in a "bizarre" manner with respect to the swords he used in the crime, and that dismemberment was not consistent with antisocial personality disorder. He also opined that defendant was not a "real sociopath."

Heinrich noted that defendant was taking several psychotropic medications at the time of the hearing. Heinrich explained that Dr. Kelly, who had evaluated defendant's fitness to plead and be sentenced, believed the medications were necessary to keep defendant fit.

At the end of Heinrich's direct testimony, defense counsel asked Heinrich, "Doctor, in your opinion on the date of the death of Mr. Estrada and Miss Mena, was Teodoro Baez suffering from an extreme mental or emotional disturbance?" Heinrich answered, "Yes."

On cross-examination, Heinrich acknowledged that he had used the term "mixed personality disorder" in his report rather than "not otherwise specified," but he asserted that the terms referred to the same thing. The State then asked about antisocial behavior disorder, and Heinrich maintained that defendant did not suffer from that disorder. He agreed that the DSM lists four criteria for a diagnosis of antisocial personality disorder, and the State asked about each criterion individually. The first criterion is that the patient display a "pervasive pattern of disregard for and violation of the rights of

-30-

others," indicated by at least three of the following: (1) failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest; (2) deceitfulness, as indicated by repeatedly lying, use of aliases, or conning others for personal property or pleasure; (3) impulsivity or failure to plan ahead; (4) irritability and aggression as indicated by repeated physical fights or assaults; (5) reckless disregard for the safety of others; (6) consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations; and (7) lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another. Heinrich acknowledged that defendant failed to conform to social norms of lawful behavior and displayed impulsivity, irritability and aggression, irresponsibility, and a lack of remorse. He denied that defendant displayed evidence of deceitfulness, but he acknowledged that defendant had lied to other psychiatrists since his arrest, and that defendant admitted that his behavior with respect to the swords was an attempt to hide evidence he had used in the crime.

The second diagnostic criterion is that the patient be at least 18 years old. The third criterion is evidence of conduct disorder, a diagnosis given only to children, with onset before age 15. The fourth criterion requires that the antisocial behavior not occur exclusively during schizophrenic or manic episodes. Heinrich acknowledged that defendant met each of these requirements. Ultimately, Heinrich agreed that defendant displayed "each and every diagnostic criteria" for antisocial personality disorder listed in the DSM-IV-TR.

*Testimony of Dr. Coleman*

Sharon Coleman, a clinical psychologist with Forensic Clinical Services, also testified for defendant. Coleman interviewed defendant twice, and prior to those interviews she reviewed the police reports of the murders, defendant's videotaped statement, and defendant's juvenile clinical records. She also reviewed defendant's previous evaluations performed by Forensic Clinical Services' Drs. Rabin, Henry, and Kelly.

Coleman testified that, on axis I, she had diagnosed defendant with polysubstance dependence and psychotic disorder not otherwise

specified, with the latter as a "provisional" diagnosis. With respect to the polysubstance dependence, Coleman opined that the origin of defendant's dependence was remarkable because it began with marijuana use with his father around age six. Coleman explained that the diagnosis of psychotic disorder not otherwise specified was based on defendant's report of "fleeting" auditory and visual hallucinations of one of his victims.

On axis II, she diagnosed defendant with "antisocial personality disorder and also with personality disorder not otherwise specified with borderline features." The court interjected to confirm that Coleman's diagnosis included two disorders, and that this was permissible under axis II. Coleman confirmed that it was. She then explained that a personality disorder usually first appears in childhood or adolescence and is "long standing" and "present in a variety of contexts." She opined that defendant would therefore have suffered from the effects of his personality disorders at the time of the murders. She also opined that defendant's symptoms were "severe enough to constitute emotional or mental disturbance."

With respect to antisocial personality disorder, Coleman testified that defendant met six of the seven diagnostic criteria: "failure to conform to social norms with respect to lawful behaviors, deceitfulness, impulsivity or failure to plan ahead, irritability and aggressiveness, reckless disregard for the safety of self and others, and lack of remorse." Coleman then explained that personality disorder not otherwise specified is a "general category for a personality disorder that does not meet one of the ten specific personality disorders," and that she had found defendant to exhibit some symptoms of borderline personality disorder, although he did not meet the full criteria for that disorder. In particular, Coleman opined that defendant exhibited "transient, stress-related paranoia, inappropriate or intense anger, or difficulty controlling anger, recurrent suicidal behavior or gestures," and "general impulsive behaviors that are reckless in nature."

Coleman testified that defendant's clinical and legal history supported her diagnoses. She noted that other evaluators had also diagnosed defendant with antisocial personality disorder and personality disorder not otherwise specified, although their diagnoses were not based on borderline features. She also stated that her review

of defendant's juvenile records showed at least five reports of abuse by his mother's boyfriend, and that defendant had twice elected to remain in the custody of the state rather than return home.

Coleman also noted that the symptoms of antisocial behavior disorder tend to improve with age, such that it was "definitely possible" that the inappropriate behavior associated with that disorder would lessen with age. She testified that defendant had expressed remorse about the murder of Janet Mena, although he had not expressed regret about the death of Juan Estrada.

On cross-examination, Coleman acknowledged that she could not say conclusively that defendant was suffering from a mental or emotional disturbance in 1999. When asked how her diagnosis differed from Heinrich's diagnosis of a mixed personality disorder, Coleman answered,

> "My diagnosis is a general diagnosis of personality disorder with related borderline features, although Mr. Baez according to my diagnosis does not meet the whole criteria for borderline personality disorder.

* * *

> Mixed personality disorder is similar to personality disorder NOS, however, it could include borderline features, antisocial features, paranoid features. It could include features of multiple or different personality disorders. [Heinrich] does not specify necessarily which personality disorders that–which features."

The State then inquired about Coleman's diagnoses as compared to those of Dr. Henry, a State psychologist who had evaluated defendant's sanity at the time of the murders. Coleman testified that her diagnoses on axis II were the same as Henry's, including the diagnosis of personality disorder not otherwise specified with symptoms of borderline personality disorder. She also agreed that her axis I diagnosis of polysubstance dependence was the same as Henry's, although her axis I diagnosis also included the provisional diagnosis of psychotic disorder not otherwise specified. She explained that her diagnosis was "provisional" because there were "symptoms present of a possible psychotic disorder but not enough information really there to make a firm diagnosis." Coleman also

agreed that the only evidence of hallucinations came from defendant's own reports to the Forensic Clinical Services evaluators after defendant was charged in this case; none of defendant's other clinical history indicated reports of hallucinations. Further, she agreed, defendant's affect and behavior in his sessions with the Forensic Clinical Services evaluators, including herself, were "inconsistent with somebody who is overtly psychotic," although she indicated that a person with a psychotic disorder could be properly medicated and in remission such that "it is still possible to observe a person who can be alert and cooperative and not experiencing hallucinations during an interview and still have a diagnosis of a psychotic disorder."

The State then asked Coleman about malingering, which Coleman testified is "exaggerating or completely feigning psychiatric symptoms for personal gain." She stated that the DSM-IV-TR recommends that malingering be "strongly suspected" if any combination of four criteria were present: (1) the person is referred by an attorney to the clinician for examination; (2) marked discrepancy between the person's claimed stress or disability and the objective findings; (3) lack of cooperation during the diagnostic evaluation and noncompliance with prescribed treatment regimen; or (4) antisocial personality disorder. Coleman agreed that defendant suffered from antisocial personality disorder and that he had been referred to her by an attorney. However, she testified that she did not believe defendant's reports of hallucinations represented a "marked discrepancy" between the reports and his previous lack of psychotic symptoms; Coleman opined that defendant had first reported hallucinations while incarcerated because that is when they first manifested.

On redirect, Coleman clarified that defendant was taking prescribed antipsychotic medication when she interviewed him, and that she therefore would not expect him to display psychotic symptoms.

### Blackamore Incident

The parties stipulated that defendant had been placed in protective custody in the Cook County jail after the Department of Corrections found credible evidence of gang threats against defendant's life.

Defendant also called Ruben Granville, who had been incarcerated with defendant and Blackamore in the Cook County jail. Granville testified that prior to the stabbing, Blackamore had repeatedly told the other inmates that defendant had a "contract on him" under which the Satan Disciples gang was willing to pay someone to kill defendant. Granville also testified that he noticed self-inflicted scratches on defendant's arms and hand. On cross-examination, Granville acknowledged that he was present in the recreation area when defendant stabbed Blackamore. He stated that although he saw the stabbing, he could not clearly see where defendant stabbed Blackamore. Similarly, he could not see the weapon defendant was using, although he did see the shank on the ground after the incident.

During its rebuttal, the State presented the stipulated testimony of UnBo Chung, an assistant State's Attorney who interviewed Granville after Blackamore was stabbed. The parties stipulated that, if called, Chung would testify that Granville told him he saw defendant stab Blackamore in the neck with a homemade knife.

### *Defendant's Statement*

After closing arguments, defendant addressed the court directly:

> "Well, I–um–I can't say nothing to bring back the family but–the victims to their family. I can't say nothing to take them home. If I get sentenced to death it's just like natural life because I'm going to die both ways. It's–it's a decision I live with everyday. I do that's [*sic*] a crime and how it affects people. But, once again, I did what I felt I had to do and that's got to be the only thing that keeps me sane. So I'll just rely on your judgment and your compassion."

### Court's Judgment and Findings

On March 9, 2004, the court sentenced defendant to death. In an oral ruling, the court first reviewed the evidence it found in mitigation. It noted that defendant's father had been abusive toward defendant and his mother and had introduced defendant to drugs sometime between the ages of four and six. It also noted that defendant had concerns at a very young age that his father had sold

-35-

defendant's soul to the devil, which the court said introduced "some bizarre feelings or thoughts on the defendant's part." However, the court also pointed out that defendant's father was out of his life by age seven.

The court believed that defendant had been physically disciplined and abused by Victor Pasarro. The court also believed that defendant and his mother had been kidnapped by Pasarro and kept for several days until Pasarro's father discovered them. With respect to Genarro Rosas's other testimony, the court opined, "this abuse, I believe, was exaggerated by Mr. Baez's brother Genarro." Specifically, the court noted that Genarro

> "testified to me that Victor Pasarro never came to the defendant when he was a ward of the state of Michigan and did not participate at all in counseling with him. And he described brutal beatings of the defendant by Victor Pasarro."

The court cited three reports of family therapy sessions and one report of a residential treatment program in which defendant's mother and Pasarro both participated. It also noted that defendant's own reports to staff were "open" and discussed being slapped and locked in his room by Pasarro and defendant's mother, but "[e]ven though he discuss[ed] the abuse on several occasions, he never discuss[ed] anything approaching what Genarro Rosas said occurred to the defendant."

The court also noted that, although several witnesses gave the impression that defendant's mother was not present, "the records indicated otherwise." The court referred specifically to reports indicating that defendant's mother was "truly interested in trying to support" intervention into defendant's life and that she had tried to get defendant into drug treatment programs.

The court found that defendant did have an antisocial personality disorder and a personality disorder not otherwise specified, and that he had those disorders at the time of the offense. However, the court also stated, "I do not believe that they were so extreme. I do not believe that they were an extreme mental or emotional disturbance."

In aggravation, the court noted defendant's long juvenile criminal history. With respect to defendant's several arrests for breaking into automotive shops and driving away vehicles, the court stated, "I

certainly don't believe he was breaking into these places to sleep in a car." The court also stated that the state of Michigan "did everything they could to try to turn Mr. Baez's conduct around," but defendant's criminal acts continued. The court then noted that the record of defendant's juvenile hearings "almost always" indicated that his mother was present. The court also discussed defendant's adult criminal history, including felony theft, armed robbery, and unlawful use of weapons.

With respect to defendant's psychosocial history, the court found that it showed defendant was "intelligent and articulate but [could] manipulate to get his own way." The court further found that defendant was not psychotic, relying on defendant's lack of psychotic symptoms prior to his arrest.

The court next noted that defendant had "committed major violations while in jail." The court specifically discussed the stabbing of inmate Blackamore, referring to Heinrich's testimony that defendant had told him that he had stabbed Blackamore in the neck "not because Mr. Blackamore had physically done anything to him but the defendant felt threatened because Mr. Blackamore was spreading a rumor that there was a price on Mr. Baez's head for the murders committed in this case." The court then recounted defendant's "unprovoked" striking of Officer Mitchell. It further noted that defendant "has of course a significant history of criminality."

The court also noted that defendant lacked remorse: "All through the records that I reviewed, there are indications that Mr. Baez does not have remorse."

With respect to the facts of the crimes in this case, the court stated, "I have been a judge for almost 17 years and it is the most ghastly set of facts I have had to deal with. These young people had an agonizing and painful death and they did nothing to deserve it."

Finally, the court turned to the sentence:

> "The death penalty is to be imposed only on the most vicious of criminals, that it should not be lightly imposed. And in almost 17 years, I have never imposed the death penalty when it was my decision.
>
> And I asked myself in this case are there any mitigating

-37-

factors sufficient to preclude the imposition of the death penalty and there was a resounding no. There are no mitigating factors sufficient to preclude the imposition of the death penalty.

And so, Mr. Baez, for the murder of these two young people, the sentence of death is pronounced on you today."

Postsentencing Motions

Defendant filed a timely motion for a new sentencing hearing and a timely motion to reduce sentence. Defendant's motions included two arguments relevant to this appeal. First, defendant's motion for new sentencing hearing argued that the court erred in applying the "no mitigating factors sufficient to preclude the imposition of death" standard when the legislature had changed the standard effective November 19, 2003, to "whether 'death is the appropriate sentence.' " At the hearing on defendant's motions, the court acknowledged that the standard had been changed. The court explained:

"When I wrote my notes on the yellow sheet of paper, I had both standards because Mr. Baez I thought had the right to elect both, and I certainly thought I said that death was the appropriate sentence. Those words I do not see in the transcript, even though I read it quickly. I certainly didn't see them. But it is clear that under either standard, death is the appropriate sentence.

There were mitigating factors, but there were no mitigating factors sufficient to preclude the imposition of death. And, therefore, death in this Court's opinion was the appropriate sentence in the case."

Later, the court added:

"I wouldn't have used the wrong standard, but I've indicated that I had the benefit of both standards, and I think that they go hand in hand. If there were mitigating factors sufficient to preclude the imposition of death, then of course death would not be the appropriate sentence. Because there are no mitigating factors sufficient to preclude the imposition of death, then death is in fact without a doubt in my mind the

appropriate sentence."

Defendant's motion to reduce sentence also argued that the court erred in failing to find that defendant suffered from an extreme mental or emotional disturbance. Similarly, the motion to reduce sentence argued that the court failed to give proper weight to Dr. Heinrich's testimony. On that point, the court stated, "Doctor Heinrich's testimony was not credible. He was just not a credible witness." Specifically, the court noted Heinrich's assertion that multiple diagnoses on axis II were impermissible, an assertion contradicted in court by Dr. Coleman and in the report by Dr. Henry. The court also noted that although Heinrich had testified that defendant did not have antisocial personality disorder, he had agreed on cross-examination that defendant met "every single one" of the diagnostic criteria. The court denied both of defendant's motions in their entirety.

## Remand

On August 29, 2005, defendant filed a motion in this court for remand to the circuit court to allow him to file a late motion to withdraw his guilty plea. This court allowed the motion, and the case was remanded.

### *Defendant's Motions on Remand*

On remand, defendant argued that the removal of Attorney Granich from the case violated defendant's right to counsel of choice under the sixth amendment and the parallel state right, as well as the due process clause of the fourteenth amendment. Defendant's motion stated that he was "discouraged by the loss of his chosen champion to represent him" and therefore "devised ways to bring about his own demise" by pleading guilty. Defendant also argued that he had been denied his right to represent himself after Granich was removed from the case. In a supporting affidavit, defendant stated, "when I inquired about pleading guilty on the day my lawyer, Attorney Jeffrey Granich, was removed from my case, I did so out of the idea that without my counsel of choice I could not receive proper, just, and unbiased representation," and "while I had considered pleading guilty to some offense in this case prior to Mr. Granich's removal as my lawyer; at

the time of his removal as my lawyer it was my understanding that were going to take the case to trial." Defendant also averred, "I felt despondent at Attorney Granich's removal from the case and believed that I had no hope in proceeding without him as my lawyer, which is when I expressed my desire to plead guilty."

On January 16, 2008, a hearing was held in the circuit court on the motion to withdraw guilty plea. Defense counsel indicated that he wished to call a number of witnesses to which the State objected on relevance grounds, and the court allowed him to make an offer of proof. Counsel indicated that he intended to call James Anderson, administrator of the Cook County portion of the Capital Litigation Trust Fund. Anderson would provide a spreadsheet of disbursements from the Capital Litigation Trust Fund from January 1, 2000, to the date of the hearing in 2008. In particular, the defense would seek to admit the portion of the spreadsheet showing disbursements in 2000 and 2001, before the Capital Litigation Trial Bar had been created. According to counsel, the spreadsheet showed "substantial" disbursements to appointed counsel, as well as investigators and experts. Counsel would highlight two cases in which payments were made to Jeffrey Granich, and additional cases in which payments were made to Barry Spector, Robert Loeb, and Debra Seaton.

Counsel also made an offer of proof with respect to the testimony of Robert Loeb, whom he intended to call for defendant. Loeb would testify that he and Debra Seaton were appointed and paid out of the Capital Litigation Trust Fund in 2000 to represent Andre Crawford, though neither of them was a member of the not-yet-created Capital Litigation Trial Bar. He would also testify that neither he nor Seaton had been retained by Crawford prior to appointment.

Finally, counsel made an offer of proof of the related testimony he would elicit from Jeffrey Granich if permitted. Granich would testify that he was appointed in two capital cases in 2000 and 2001, although he was not a member of the Capital Litigation Trial Bar at the time, nor had he become a member since. He would also testify that he was not appointed "on the eve of trial," although one of the cases was "fairly far along" at the time of his appointment. In addition, Granich would testify that one of the cases took at least a year and a half to be tried.

The State objected, arguing that the proffered testimony was

-40-

irrelevant, because its theory was that the court had discretion to appoint and remove Granich. The court responded to the arguments by stating:

> "Counsel, you have made your offer of proof. Your offer of proof will be in the record. You can take your spreadsheets and you and put them in the record. The Supreme Court will be able to see them if you lose this motion to withdraw.
>
> I have read the entire conversations that I've had during the course of this case with Mr. Baez. I don't think it's relevant, but that will be for the Supreme Court to see if the case gets back to them. So you can certainly–as I just said, you've made your offer of proof and you can mark your spreadsheets as [an] exhibit."

The court then referred to the entries on the spreadsheet showing that it had personally made appointments of private counsel, saying:

> "[THE COURT:] So, yes, I knew the fund was there, I used it and I helped to write–I was on the committee that was initially assigned to write the Capital Trial Litigation Rights, so I know that that requirement didn't come into existence until 2002. So you can certainly put those documents in the record, I will take the offer of proof, and as I said, once we resolve the motion to dismiss [*sic*], if you lose the Supreme Court will have the evidence.
>
> It's not contested by the State, is it, that that's what he would say?
>
> [Assistant State's Attorney] MR. RICHARDS: No.
>
> [Assistant State's Attorney] MR. MURPHY: No.
>
> THE COURT: All right. Then the State's not contesting it, it's in."

The defense then rested. The State called Granich, although it indicated for the record that it was doing so at the request of the court. Granich testified that he was contacted by defendant's girlfriend and paid $6,500 to represent defendant, which did not represent his total fee. Granich estimated that he would generally charge $20,000 to $50,000 to defend a client charged with a double murder, and that up to the date of his motion to be appointed as counsel, he had billed $3,000. According to the motion, that $3,000 represented 12 hours

reviewing the file, 3 hours on court appearances, and 5 hours on client conferences. Granich testified that he spent additional time on the case after the motion was filed, but he would not speculate as to how much time. Granich also agreed that when he was removed from the case it was "not even close" to being ready for trial.

With respect to his vacation, Granich told the court that he left for Israel in late May or early June 2001 and returned to Illinois in October 2001. After "three or four months," Granich again left for Israel, where he stayed another three or four months before returning to Illinois. While he was gone, attorney Loren Blumenfeld managed his office "to take care of the day-to-day operations." John Theis, whom Granich had sought to have appointed in this case, also took "one or two" of Granich's cases. According to Granich, "Any case that was pending when I left in the early Summer of 2001 an additional attorney would have filed an appearance and we shared responsibility." When asked about his plans in this case, Granich responded, "If I would have maintained responsibility on the case I would have communicated with my office and the defendant through letter, by coming back to Chicago, speaking to my clients when necessary, preparing my clients when necessary to testify, and doing anything ordered by this court." Granich explained that he had anticipated communicating with defendant by phone and letter while in Israel, and the court interjected, "You didn't tell me you were going to communicate; you told me you were going to be gone and Mr. Theis was going to carry on the case while you were out of town and you'd return to try that case. That's what you said to me." Granich replied, "And Judge, that's what I mean, that I would continue my responsibility and do whatever I needed to do to try this case." Later, Granich stated, "I didn't know how long I was going to be gone for so I hoped Mr. Theis would come on the case, try it with me, cover any court date that I could not make and work on the case together. My intention if my appointment would have continued would have been to try the case with Mr. Theis." He agreed that he had told the court that he anticipated that Theis would "carry on the case" while Granich was out of town and that Granich would "return to try the case," but he asserted, "To me trying a case means to litigate any motion that needs to be litigated."

Granich acknowledged that he did not advise the court in his

motion for appointment that he planned to leave the country. He further acknowledged that, after he informed the court of his plans, the court asked him to submit in writing the dates he intended to be out of the country and he did not do so. Granich maintained that he did not know how long he was going to be out of the country at that time, although he told the court "months." He explained, "I kind of just really wanted to see what was going to happen when I got there. It was kind of a situation where I wanted to keep one foot here and I wanted to put one foot out there without necessarily losing what I had developed at that point." Granich acknowledged that he was thinking about living in Israel. He did not recall discussing his plans with attorney Stuart Smith.

When the State's questioning was complete, the court asked Granich if he had tried any death penalty cases prior to his April 2001 motion for appointment; Granich answered that he had not. Granich also stated that he believed Theis had tried federal death penalty cases, which was part of the reason Granich sought Theis's assistance in this case.

On cross-examination, defense counsel asked several questions about Granich's April 26, 2001, appointment. The court interrupted the questioning, saying, "There is no issue that he was appointed. It seems to me that you're wasting my time. He knows he was appointed. I said he was appointed, I said he was appointed, and a few days or less than a month later I struck the appointment. It's not whether he was appointed or not. Clearly he was appointed."

Defense counsel also asked Granich if he had contacted a mitigation specialist, and Granich said that he had. Granich agreed that a mitigation specialist "can take at least months and maybe years" to develop a mitigation case. Counsel then asked, "So, in fact, when you had gone that four months, wasn't it your plan that if a mitigation specialist was appointed it was going to continue?" Granich answered, "Yes." When counsel asked "Would not a mitigation specialist be working on gathering records and doing the leg work on the case?" the State objected, and the court said, "That objection is sustained as to what would have happened if he had been gone four months. No one had been appointed, no one had been hired. He said he had talked to somebody."

Finally, Granich agreed that he was "ready, willing, and able" to

continue representing defendant if his appointment had been continued.

The State also called Stuart Smith at the court's request. Smith testified that he did not have an "independent recollection" of any of the proceedings in this case on May 22, 2001. Similarly, Smith claimed he could not recall having a conversation with Granich about his travel plans or about anything else that day. He pointed out that there was another Mr. Smith in the public defender's office, but he agreed with the court that the transcript indicated that "Stuart Smith" was present.

On cross-examination, Smith told the court that prior to his appearance on May 22, 2001, defendant was "very upset and was actually hanging from the top bars in the lock-up in the back based on his being very upset." After questioning from the court, Smith clarified that defendant was hanging from his arms and "climbing the walls."

*Court's Rulings*

On February 19, 2008, the court denied defendant's motions in an oral ruling. With respect to defendant's claim that he was denied his request to represent himself, the court said that it was "unsupported by the record" and "a waste of [the court's] valuable time." The court reviewed the transcripts, noting that defendant had agreed to meet with Buchholz and discuss the case, and at his next appearance defendant had "without any prompting" stated, "And I agree to have counsel represent me." Thus, the court found, "He never unequivocally decided to represent himself and, in fact, agreed to continue with the public defender without me asking him."

The court then turned to defendant's argument that his guilty plea was not knowing and voluntary. It again reviewed the relevant dates and appearances, summarized above. It noted that on April 26, 2001, it had not read the motion for appointment of counsel, but it appointed Granich knowing that it "had discretion to appoint counsel." However, the court asserted that when it appointed Granich it did not know "that Mr. Granich had not been retained by Mr. Baez to represent him." The court also noted that it was only after he was appointed that Granich told the court he was requesting a second

-44-

person. When Granich later told the court he would be leaving the country, the court stated, it became clear that Granich "was actually asking for substitute counsel to take over in his place."

The court also discussed Granich's statement at the April 26 appearance that Theis would "take over the litigation of this case until I return." The court found that Granich's testimony on remand that he intended to return and litigate motions "lacked credibility." Referring to Granich's statements on May 9, 2001, that he "anticipated Mr. Theis would carry on the case while [Granich] was out of town," the court further found that at the remand hearing Granich "was not truthful to the court when he said that he would return to litigate any motions that were filed in this case pretrial."

The court then discussed the May 22, 2001, appearance at which it struck Granich's appointment:

> "On May 22, 2001, I said I did not think that I could legally appoint two counsel because there really was no basis for appointing private counsel. When I said legally, I didn't mean pursuant to the Capital Crimes Litigation Act.
>
> Personally, I have always appointed the public defender's office when people cannot retain private counsel. I would not appoint private counsel unless, for instance, there was a conflict of interest with the public defender's office or if a defendant had actually retained private counsel.
>
> When I say retain them, I mean pay them a substantial portion of their fee and that the case was close to trial and that it would delay the disposition of my case if private counsel was not appointed.
>
> Mr. Granich told me sometime during this period of April 26th to May 22nd that he had received a nominal amount of funds. In reviewing the motion for appointment, he said he had received a little over $6,000. No attorney is retained in a double murder for $6,000. That is a possession of a stolen vehicle fee, a possession of a controlled substance fee, maybe a residential burglary fee. Mr. Granich was not retained. Mr. Granich knows he was not retained.
>
> Frankly, I believe that Counsel had taken a case that he knew he would not be compensated for and was requesting

-45-

this Court to appoint he and another attorney who would be paid by the County rather than by the defendant."

The court also noted that Granich "was not only asking for two attorneys to be appointed, he was asking for substitute counsel to take his place while he decided what his future course was going to be in his own practice." The court then stated:

> "When I made my record, I did not want to embarrass Mr. Granich. When Mr. Smith said that Mr. Granich said he would be gone for at least six months, I did say I told Mr. Granich to put it in writing how long he was going to be gone and he didn't do it. I did say at the time it wasn't a major issue in the case, and it was not a major issue. It was not dispositive, but, of course, it was an issue.
>
> He was, in effect, asking for substitute counsel for Mr. Theis for him. He was going to be gone, leaving Mr. Theis to resolve all pretrial issues alone. He didn't know when or if he was coming back. He was unsure if he would actually move to Israel. His absence, of course, would delay the proper progress of this case."

With respect to defendant's demeanor after Granich was dismissed, the court said, "Mr. Baez was not upset or concerned at all about me striking my appointment of Mr. Granich once I had found out that he had not been retained in this case and that he had basically deceived the Court and tried to get the court to hire two private counsels to represent Mr. Baez." The court also addressed Smith's testimony that defendant was agitated by the changes in his counsel: "When Stuart Smith testified in my courtroom regarding Mr. Baez climbing the walls, I believe that was an absolute lie by the attorney." The court called Smith's testimony "an outright and deliberate lie to this Court," noting,

> "My sheriffs monitor my lockup. I can hear the lockup. When there is any noise in my lockup, I go back and see what is going on.
>
> Mr. Baez has comported himself always as a gentleman in my courtroom. He has always demonstrated respect for me, as I have for him. This incident did not occur. Mr. Stuart Smith is a liar.

-46-

Mr. Baez on that date, on prior dates and subsequent to that date[,] comported himself always as a gentleman. My sheriffs never had any problem with him. He engaged me personally on almost every court date with any concern that he had."

The court then addressed defendant's request to plead guilty. It noted that it had responded to defendant's request by pointing out that defendant had made the request before, and that defendant had said that he had been thinking about pleading guilty "since the incident occurred." The court further stated, "Mr. Baez had said before he wanted to plead guilty in this courtroom, whether it was coming in or going out. Whether the court reporter caught it or not, Mr. Baez had said that to me." The court then noted again that defendant agreed to wait and talk to his lawyers, and that defendant "was not upset" when he left. The court further noted that defendant had "always communicated any concerns" that he had to the court.

The court also pointed out that, prior to his plea, defendant had been evaluated by Dr. Coleman, who indicated that defendant was able to "intelligently discuss his decision to enter a plea of guilty." Coleman reported that defendant felt the plea would give him "closure," and that he intended to cooperate with and assist his attorneys.

The court then addressed the affidavit defendant had submitted in support of his motion to withdraw the guilty plea. It noted that defendant had averred that he pleaded guilty "out of the idea" that he could not receive "proper, just and unbiased representation" without his counsel of choice. The court responded, "That lacks credibility. *** I believe Mr. Baez did not testify in my case because he didn't want to get on this bench and lie in front of me because we have always been honest and truthful with each other. I believe his affidavit is a lie. There is no support for that statement in the record or anything that happened in this courtroom." As to defendant's representation that he feared he would not receive proper representation from the public defender's officer, the court found, "That is a lie." With respect to defendant's assertion that at the time of Granich's removal defendant anticipated going to trial, the court stated, "That is an incredible statement. As I said, given the weight of evidence against this defendant, the horrendous nature of this case,

-47-

Mr. Baez's only hope was to plead guilty to the case." Similarly, the court called the affidavit's assertion that defendant was "despondent" at Granich's removal "a lie." The court noted that defendant was "pleasant and happy when he left this courtroom that day."

Finally, the court summarized its findings:

> "Mr. Baez always wanted to plead guilty in this case. He never retained Mr. Granich. Mr. Granich misled this court when I first appointed him. It was certainly a mistake on my part, which I corrected immediately.
>
> It had nothing to do with the Capital Crimes Litigation Fund. I mean my decision had nothing to do with it. My decision was that the defendant had not retained counsel. If he had retained counsel and paid for him to represent him, certainly he would have had the right to keep him if he paid him. He did not.
>
> He has the right to counsel, but not counsel of his choosing unless he retains them. When he is appointed counsel, then the Court appoints counsel that they believe should be appointed, and that is, in my mind, the public defender's office.
>
> In terms of his guilty plea, it was freely and voluntarily entered. There was no mistake of law on his part. There was no mistake of law in this case. He did not plead guilty because his, quote, unquote, champion had been removed. He pled guilty because he wanted, quote, closure, as he said, in his mind for the horrendous offenses that he had perpetrated on two innocent people.
>
> Of course, the demands on my calendar, as I said, were certainly an issue in this case, that I was going to have the case delayed, possibly substitute counsel and a lawyer who didn't know when or if he was coming back.
>
> * * *
>
> Again, as I said, the defendant in this case wanted to plead guilty, always wanted to plead guilty, was never denied a right to counsel. He pled guilty because he had no choice. He was going to be convicted, and anyone who heard the facts of this case was going to sentence Mr. Baez to death."

-48-

ANALYSIS

I. Right to Counsel

Defendant first argues again that the court's removal of Granich violated defendant's sixth amendment right to counsel and the parallel right under the state constitution. Specifically, defendant alleges a violation of his right to counsel and his right to counsel of choice. Defendant further argues that this violation is not subject to harmless-error review and that all proceedings after Granich's removal on May 22, 2001, are "void and unconstitutional."

The sixth amendment to the United States Constitution provides: "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. The Supreme Court has held that the right to retained counsel of choice is included in the sixth amendment right to counsel. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006); *Wheat v. United States*, 486 U.S. 153, 159 (1988). The Illinois Constitution's guarantee that "the accused shall have the right to appear and defend in person and by counsel" likewise encompasses the right to counsel of choice. Ill. Const. 1970, art. I, §8; *People v. Holmes*, 141 Ill. 2d 204, 217 (1990). Violations of the right to counsel of choice are structural error not subject to harmless-error review, and they therefore do not depend on a demonstration of prejudice by defendant. *Gonzalez-Lopez*, 548 U.S. at 147-48.

However, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, the right to counsel of choice is " 'circumscribed in several important respects.' " *Gonzalez-Lopez*, 548 U.S. at 144, quoting *Wheat*, 486 U.S. at 159. Defendants may not, of course, insist on representation by an advocate who is not a member of the bar. *Wheat*, 486 U.S. at 159. Similarly, a defendant "may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." *Wheat*, 486 U.S. at 159.

Because the right to counsel is not absolute, the trial court is

granted discretion to remove defense counsel under certain circumstances. *Burnette v. Terrell*, 232 Ill. 2d 522, 535 (2009) ("The principle that a judge has the discretion to remove defense counsel *** is not in dispute."). For example, removal may be necessary when counsel is intoxicated or when counsel's performance is so inadequate that the defendant is not receiving the level of assistance of counsel guaranteed by the sixth amendment. *Burnette*, 232 Ill. 2d at 534-35. This court will not disturb the trial court's decision to remove counsel absent an abuse of discretion. See *Burnette*, 232 Ill. 2d at 535. " 'An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *People v. Patrick*, 233 Ill. 2d 62, 68 (2009), quoting *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

In addition to the limitations on the right to counsel of choice noted above, a trial court is granted "wide latitude in balancing the right to counsel of choice against the needs of fairness [citation] and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152. Thus, "[a] judge may also remove defense counsel when the demands of the court's calendar necessitate the trial be held when current counsel is unavailable." *Burnette*, 232 Ill. 2d at 534. In sum, as the appellate court has noted, defendant's chosen counsel must stand "ready, willing, and able" to provide competent representation. See *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008).[5]

In this case, the court removed attorney Granich after learning that he was not ready to provide representation to defendant. According to Granich, his motion requested that the court appoint both himself

---

[5]We note that the right to counsel of choice does not extend to defendants who require counsel to be appointed for them. *Gonzalez-Lopez*, 548 U.S. at 151; *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Defendant acknowledges this, but he argues that once an attorney is appointed for an indigent defendant, the defendant has the same right to continue with that attorney as a defendant who hires an attorney. The State disputes this assertion, arguing that an indigent defendant has no right to counsel of choice that would inhibit a court's ability to remove appointed counsel. Because we find that Granich's removal was permissible under the protections afforded to retained counsel, we need not resolve this dispute.

and attorney Theis. After the court agreed to appoint Granich, Granich explained to the court that he was leaving on vacation and had anticipated that Theis "would take over the litigation of this case until I return." Later, Granich reiterated, "what I had anticipated was Mr. Theis would carry on the case while I was out of town and then I would be returning to try the case." When the court characterized his request as asking for "substitute counsel" rather than the appointment of two simultaneous attorneys, Granich did not challenge the characterization. Although Granich told the court on remand that he planned to share responsibility for the case while out of the country, the court specifically found that testimony "lacked credibility" and was "not truthful."

We also note that Granich never provided the court with specific dates he planned to be away, despite the court's direct request that he submit that information in writing. Granich's testimony at the remand hearing suggests that he did not himself know when he would return. As he told the court, "I kind of just really wanted to see what was going to happen when I got there. It was kind of a situation where I wanted to keep one foot here and I wanted to put one foot out there without necessarily losing what I had developed at that point." Although the record does not indicate that the court had this information at the time it removed Granich from this case, the record does reflect that the court knew Granich would be gone for "months" and was not certain when he would return. The court also knew Granich was considering moving to Israel.

In light of these facts, we find that the court did not abuse its discretion by removing Granich from the case. Granich did not and likely could not tell the court when he would return from his vacation to Israel, but he did make it clear to the court that attorney Theis would "carry on the case" in the interim. Despite his testimony on remand that he was "ready, willing, and able" to represent defendant, Granich's request that Theis be appointed to conduct the case while Granich was gone undermines his claim. In fact, Granich made it clear that, although Theis may have been ready, willing, and able to take on the case, Granich's personal travel plans would prevent him from stepping in until he returned at some unknown date in the future.

Defendant acknowledges that the trial court has the discretion to remove defense counsel when the demands of the court's calendar

necessitate removal. However, defendant argues that the court did not make an "adequate inquiry" into Granich's travel plans before removing him. Defendant asserts that the court should have asked Granich "how he organized his practice and who would manage it while he was gone and how he planned on covering Mr. Baez's case while away," and that had it done so it would have found that Granich's plans "posed no real obstacle to the progress of this case." We disagree.

When removing an attorney from a case, a trial court should make a record that is "sufficient for a reviewing court to determine whether circumstances justified the removal." See *Burnette*, 232 Ill. 2d at 535. Here, when the court first found out on May 9, 2001, that Granich was going to be gone for an extended period of time, it asked whether counsel would "even do the case." Granich responded, "I anticipate returning and trying this case when necessary, Judge, but, what I had anticipated was Mr. Theis would carry on the case while I was out of town and then I would be returning to try the case." Granich also told the court that he planned on leaving "as of May 25th," giving the court less than one month to determine how to proceed. The court asked Granich to put his plans in writing, but Granich did not. At some point prior to the May 25 court appearance, the court had a discussion in chambers with Granich and the State. Although the full contents of that discussion were not made part of the record, the court did state on the record that Granich had said he thought he would be gone for "months."

The record demonstrates that the court did inquire into Granich's plans, both regarding his vacation and regarding how he intended to handle this case. As we have already stated, Granich's responses to the court's inquiries made clear that Granich's personal future was uncertain, but that he intended to have another attorney handle defendant's case while he was gone. Further inquiry into how Granich managed his practice or how he planned to handle other cases during his absence would have been irrelevant and unnecessary. The court's inquiry was sufficient to demonstrate that Granich was not ready to provide representation to defendant in this capital case.

Defendant also argues that the court's other proffered reasons for withdrawing Granich's appointment were legally unsound, referring specifically to the court's assertion that it needed a reason to appoint

private counsel and that it could not appoint more than one attorney. Because the reasons discussed above provided adequate grounds to remove Granich, however, we need not address defendant's argument that the other proffered reasons were inadequate. Similarly, defendant disputes the court's finding that Granich was never retained by defendant. Because our analysis of this issue does not turn on whether Granich was truly retained prior to his appointment, we do not address this argument.

## II. Motion to Withdraw Guilty Plea

Defendant also argues that the circuit court erred when it denied his motion to withdraw his guilty plea. The decision to grant or deny a motion to withdraw a guilty plea rests in the sound discretion of the circuit court and, as such, is reviewed for abuse of discretion. *People v. Delvillar*, 235 Ill. 2d 507, 519 (2009); *People v. Walston*, 38 Ill. 2d 39, 42 (1967). A defendant does not have an automatic right to withdraw a plea of guilty. *People v. Jamison*, 197 Ill. 2d 135, 163 (2001). Rather, defendant must show a "manifest injustice" under the facts involved. *Delvillar*, 235 Ill. 2d at 520; *Jamison*, 197 Ill. 2d at 163. The decision of the trial court will not be disturbed unless the plea was entered through "a misapprehension of the facts or of the law" or if there is doubt as to the guilt of the accused and justice would be better served by conducting a trial. *Delvillar*, 235 Ill. 2d at 520.

Defendant argues that he was "under the misapprehension that the court had the power and authority to remove his counsel, Mr. Granich, and he never learned that the court's action violated his constitutional rights until his appeal." As we have explained, however, the court did not abuse its discretion in removing Granich. Put differently, the court in fact did have the power and authority to remove Granich under the circumstances; defendant's belief in this regard was therefore not a "misapprehension" at all and his motion was properly denied.

Defendant also argues that the court erred in "declining to consider" certain evidence he offered at the hearing on the motion to withdraw his guilty plea. A court's decision to exclude evidence is reviewed for abuse of discretion. *People v. Wheeler*, 226 Ill. 2d 92, 133 (2007). Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of

the action more probable or less probable than it would be without the evidence.' " *People v. Monroe*, 66 Ill. 2d 317, 322 (1977) (quoting Fed. R. Evid. 401). First, defendant contends that the court should have considered the spreadsheet of expenditures from the Capital Litigation Trust Fund. He asserts the spreadsheet was relevant because it shows that Granich "was appointed in capital cases" and that "the court did not always appoint the public defender office [*sic*] but appointed private counsel in August, 2000, in one case." Similarly, defendant argues that the testimony of attorney Loeb that he and attorney Seaton were appointed as private counsel in a capital case was improperly ignored.

Initially, we note that the record suggests that the court did, in fact, consider the spreadsheet when it was offered. Although the court stated that the spreadsheet was irrelevant, it also discussed the contents of the spreadsheet with counsel, and it said, "the State's not contesting it, it's in." Even if the court did not consider this evidence, however, we would hold that the court did not abuse its discretion. While we acknowledge that the spreadsheet does tend to establish that Granich was appointed in capital cases and the court did not always appoint the public defender, defendant does not explain why those facts are relevant. The issue defendant raised at the hearing on the motion to withdraw his guilty plea was whether the court properly removed Granich in this case. As we have explained, the relevant question is whether Granich was ready, willing, and able to represent this defendant in this case at the time of his removal. The fact that Granich or any other private attorney was appointed in other, unrelated capital cases at other times is not relevant to that determination. Moreover, we note that even if error occurred, such error was harmless given the court's repeated acknowledgments that it had the authority and discretion to appoint Granich.

Defendant also argues that the court improperly refused to consider the proffered testimony from Granich about his experiences as appointed counsel in other capital cases, including a case he and attorney Blumenfeld handled jointly while Granich was traveling back and forth to Israel. Defendant argues that this testimony was relevant "to show Mr. Granich had experience in preparing a capital case." Granich's experience, however, was never at issue. The court therefore did not abuse its discretion in finding that evidence

-54-

regarding Granich's experience generally was not relevant. Defendant asserts that the evidence of how Granich handled other cases during his travels was also relevant to "refute[ ] the concerns the circuit court had that the Public Defender Office [*sic*] was needed in place of Mr. Granich and associates." We disagree. The only case at issue in the hearing to withdraw defendant's guilty plea was the present case. Regardless of how Granich handled other pending cases at the time, he made it clear to the circuit court that he intended for attorney Theis to take over this case while he was gone.

Finally, defendant argues that the court erred in excluding Granich's testimony about what a mitigation expert would have done had she been hired after Granich's appointment. He asserts that it was relevant to show that Granich's absence would not have delayed the case. He also argues that the court's ruling was "highly inconsistent" with its hearing of the State's questions to Granich about what he would have done if he had remained on this case. Neither argument is persuasive. In contrast to the State's questions about what Granich's intentions were at the time of his removal, defendant's excluded question pertained to what a mitigation specialist, who had not been hired or retained, might have done had Granich been retained and had Granich hired her. Contrary to defendant's assertion, Granich's testimony that he had already contacted a specialist–testimony that was relevant to Granich's plans and preparation as of his removal–was admitted; the court's ruling on the State's objection specifically noted, "He said he had talked to somebody." Further testimony about what the specialist, who had not been hired as of the date of Granich's removal just three days before he planned to leave the country, might have done was not relevant to the question of whether Granich was ready, willing, and able to represent defendant. We hold that the court did not abuse its discretion in refusing to admit this testimony.

### III. Defendant's Right to Represent Himself

After Granich was removed from the case, defendant appeared with Assistant Public Defender Buchholz twice before September 25, 2001, when he appeared a third time represented by Buchholz. At that meeting, while discussing a letter defendant sent to the court, defendant indicated that he was asking to represent himself. The court

asked if they had discussed the issue before, and defendant said, "No, we had a discussion about me receiving a new lawyer, and that ended in a no. And then I tried to obtain my own lawyer, and we're all familiar with the outcome of that, and I'd like to proceed pro se." The court responded, "You certainly have the right to proceed pro se, Mr. Baez, if you want to do so. I wouldn't suggest it. But you certainly have the right to do so." As we have recounted in more detail above, the court told defendant that it would be "unwise" for him to represent himself. Referring to the letter defendant had sent, the court noted that defendant wanted Buchholz to "have a serious conversation" on his behalf; as the court noted in the hearing on remand, it is clear that the court and defendant were discussing a plea negotiation. The court explained that before he could begin negotiations, Buchholz needed time to collect and review every relevant piece of information. When defendant stated "I don't think anybody knows anything better pertaining to the case than I," the court responded, "Well, you know, you may know more about what happened. But you don't know about the law, Mr. Baez. You don't know the negotiation process, because you have never been in this position." Defendant answered, "Exactly." The court then stated,

> "You can do whatever you like. If you want to represent yourself, I'll give you all the admonishments that the law requires, and if you decide to represent yourself against my advice, I mean, that's what you will do.
>
> But you will be at such a disadvantage, you will be at such a disadvantage if you are negotiating with the State on your own, you might tell them things Mr. Buchholz might not tell him. You might tell them things that would help them try the case against you rather than help you out.
>
> He knows the things that are going to benefit you and he knows the things that are going to hurt you, because he knows the law and you don't.
>
> So I would suggest that you let him proceed on your case."

When defendant maintained that he felt representing himself was the "best thing" for him, the court responded:

> "All right.

We can do–would you do this for me? Before you make your decision, will you let Mr. Buchholz review the materials he has, sit down with you one more time and talk about the case, talk about–if you still desire to do what you say in this first paragraph, and if you sit down with him and he will talk to the State before the next date, I'll give you a long enough date to have that conversation, and he can give you an answer from the State, whatever.

Once you have had that conversation, if you still want to get rid of your lawyer, I'll give you all your admonishments and then you will proceed on your own.

But once you make that decision, you will be on your own. Mr. Buchholz won't help you, because I will not appoint stand-by counsel. *** I want you to know that If you decide to represent yourself, I don't help you at all.

You're in an unbelievably terrible position when you try to represent yourself. *** I would not possibly represent myself, even as a lawyer, and I have been a judge fourteen years, a lawyer for twenty-seven. I would not represent myself no matter what the charge was.

All right?"

Defendant replied, "Yes, ma'am."

Later, when Buchholz indicated that he had hired a mitigation expert, the court turned again to defendant and said,

"What he's saying, he's hired a mitigation expert. That expert has to interview every witness that you give him that he believes would have information that would benefit you. A mitigation expert.

* * *

And it would be something he could utilize trying to negotiate for you, too.

So I think you ought to be a little more patient and realize that even though you think that representing yourself might be to your benefit, it may seal your fate.

All right?"

Defendant again replied, "Yes, ma'am."

-57-

At defendant's next appearance, on November 13, 2001, Buchholz told the court that he and defendant had met to discuss all of the relevant evidence and how defendant wished to proceed in the case. Turning to defendant, the court said, "You have got[ten] to talk to your attorney and see the videotape." Before the court asked any questions, however, defendant responded, "And I agree to have counsel represent me."

Defendant now argues that he made a "clear and unequivocal" request to represent himself that was improperly "deferred" by the court, in violation of his sixth amendment rights and his rights under the Illinois Constitution. For the reasons below, we reject defendant's claim.

A defendant has a constitutional right to represent himself. *Faretta v. California*, 422 U.S. 806, 835 (1975); *People v. Burton*, 184 Ill. 2d 1, 21 (1998). In order to represent himself, a defendant must knowingly and intelligently relinquish his right to counsel. *Faretta*, 422 U.S. at 835; *Burton*, 184 Ill. 2d at 21. It is "well settled" that waiver of counsel must be clear and unequivocal, not ambiguous. See *Burton*, 184 Ill. 2d at 21 (collecting cases). A defendant waives his right to self-representation unless he " 'articulately and unmistakably demands to proceed *pro se*.' " *Burton*, 184 Ill. 2d at 22, quoting *United States v. Weisz*, 718 F.2d 413, 426 (D.C. Cir. 1983). The purpose of requiring that a criminal defendant make an unequivocal request to waive counsel is to: "(1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *People v. Mayo*, 198 Ill. 2d 530, 538 (2002).

In determining whether a defendant's statement is clear and unequivocal, a court must determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation. *Burton*, 184 Ill. 2d at 22. Courts must "indulge in every reasonable presumption against waiver" of the right to counsel. *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Burton*, 184 Ill. 2d at 23. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background,

experience, and conduct of the accused. *People v. Lego*, 168 Ill. 2d 561, 565 (1995). We review a trial court's determination for abuse of discretion. See *Burton*, 184 Ill. 2d at 25 (finding no abuse of discretion in requiring counsel's continued representation); *People v. Jackson*, 228 Ill. App. 3d 868, 875 (1992).

Although a court may consider a defendant's decision to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted. *Lego*, 168 Ill. 2d at 563-64; *People v. Silagy*, 101 Ill. 2d 147, 179-80 (1984). However, "[a]lthough a defendant need not possess the skill and experience of a lawyer in order to choose self-representation competently and intelligently, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." (Internal quotation marks omitted.) *Lego*, 168 Ill. 2d at 564 (quoting *Faretta*, 422 U.S. at 835, and *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). The requirement of knowing and intelligent choice "calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Lego*, 168 Ill. 2d at 564 (citing *Patterson v. Illinois*, 487 U.S. 285, 292 (1988)). Even if a defendant gives some indication that he wants to proceed *pro se*, he may later acquiesce in representation by counsel. *Burton*, 184 Ill. 2d at 23.

Defendant argues that he made a clear and unequivocal request to waive counsel on September 25, 2001, and that the court was required to grant defendant's request immediately. We disagree. As noted above, the court had an obligation to make defendant aware of the dangers and disadvantages of self-representation, particularly given the capital nature of this case. Moreover, we find that the court did not abuse its discretion when it asked defendant to meet with his attorney again before making a final decision. In *People v. Mayo*, 198 Ill. 2d 530 (2002), after the defendant asked to discharge his attorney, the court asked the defendant to meet with counsel again before waiving his right to representation. Although the issue before this court was whether the ensuing delay should have been attributed to the defense, we noted, "the trial court made a reasonable presumption against defendant's desire to waive counsel and not grant his request to proceed *pro se* until it was sufficiently satisfied that those were in

fact defendant's wishes." *Mayo*, 198 Ill. 2d at 539.

In this case, the court knew that defendant had previously complained about the level of communication he had with Buchholz; the court's first response to defendant's request to represent himself was to ask whether Buchholz had talked to defendant recently. Upon learning that Buchholz had been prevented from meeting with defendant due to his travel and the events of September 11, the court asked defendant to have a meaningful discussion about the case with Buchholz before deciding to proceed alone. Importantly, the court made it clear to defendant that it was not denying defendant's request. Indeed, the court repeatedly indicated its willingness to grant defendant's request once defendant had reviewed all of the relevant information, saying, "If you want to represent yourself, I'll give you all the admonishments that the law requires, and if you decide to represent yourself against my advice, I mean, that's what you will do." Later, when it asked defendant to have a discussion with Buchholz, the court repeated, "Once you have had that conversation, if you still want to get rid of your lawyer, I'll give you all your admonishments and then you will proceed on your own."

Defendant argues that the "*Faretta* violation" was complete on September 25, and that we should not look to any subsequent events to determine whether defendant unequivocally waived his right to counsel. However, as noted above, a defendant may acquiesce in representation by counsel even after asserting his desire to proceed *pro se*. Thus, "courts may look at the defendant's conduct following the defendant's request to represent himself." *Burton*, 184 Ill. 2d at 24. Here, defendant agreed at his next court appearance, without any prompting from the court, to representation by counsel, stating, "And I agree to have counsel represent me." Consequently, defendant made no further requests to represent himself. At his guilty plea months later, the court asked defendant specifically whether he was satisfied with his representation, and defendant agreed that he was. The court also asked if there was anything defendant wanted counsel to do that they had not done, and defendant replied, "No, they pretty much go do what I ask."

Defendant argues that his subsequent acceptance of representation by counsel should not be viewed as an abandonment of his prior request, citing *Orazio v. Dugger*, 876 F.2d 1508, 1512 (11th Cir.

1989), but that case is distinguishable. In that case, the court of appeals found that the district court erred in finding that the defendant accepted representation by failing to reassert his desire to represent himself. The court noted that the defendant had "clearly and unequivocally" requested to represent himself, but "because the judge considered Orazio unequipped to 'meet the challenges' of the charges against him, he denied Orazio's request." *Orazio*, 876 F.2d at 1512. In contrast, as we have noted, the court in this case never denied defendant's request, and it repeatedly assured defendant that he could proceed *pro se* should he still desire to after discussing the case with Buchholz. Additionally, while the court in error in *Orazio* found acquiescence in the defendant's mere silence following the denial of his request, defendant in this case was not merely silent; he affirmatively told the court he agreed to have counsel represent him. Under these circumstances, we find that defendant withdrew his request to proceed *pro se* and acquiesced in his representation by counsel. We therefore hold that the court did not abuse its discretion by failing to give defendant the proper admonishments and allowing him to represent himself.

## IV. Extreme Mental or Emotional Disturbance

Defendant argues that the circuit court erred in rejecting his claim that he suffered from an "extreme mental or emotional disturbance" at the time of the murders. The State equates defendant's argument on this point to his argument that death was not the appropriate sentence, but defendant maintains that "the question of the sufficiency of the evidence" is separate from the question of whether death was the appropriate sentence. He further argues that "[w]hether the evidence is sufficient to support a statutory mitigating factor is a question of law and so must be reviewed under a *de novo* standard of review," citing *People v. Brownell*, 79 Ill. 2d 508 (1980). Under a separate heading, defendant argues in the alternative that the court "manifestly erred" if, rather than finding that the evidence was not sufficient to support the mitigating factor, the court instead found the evidence sufficient but rejected the mitigating factor anyway.

In *Brownell*, this court addressed a circuit court's determination that the defendant did not commit murder while under the influence of an extreme mental or emotional disturbance, holding, "While in a

case of this gravity this court will make a separate evaluation of the record, we should not lightly overturn the findings of the trial court, particularly when they are amply supported by the record." *Brownell*, 79 Ill. 2d at 539-40. Defendant asserts that, in so stating, we applied a *de novo* review, arguing "[a] separate evaluation of the record by the reviewing court equals *de novo* review." Defendant's reading of *Brownell* ignores the remainder of the above-quoted sentence. This court's insistence that it would "not lightly overturn the findings of the trial court" clearly indicates that this court did not simply apply a *de novo* review.

More recently, in *People v. Thompson*, 222 Ill. 2d 1, 34-36 (2006), we discussed at length the standard of review that we apply to the trial court's determination of sentence in a capital case. We noted "qualitative difference between death and imprisonment as penalties," and we refused the State's invitation to apply a "pure abuse of discretion standard of review." *Thompson*, 222 Ill. 2d at 35. Instead, we held that "it is appropriate to give some deference to the trial court or jury on matters involving factual and credibility determinations [citation], while at the same time subjecting the record to intense scrutiny to ensure that only those deserving of the ultimate penalty are so sentenced." *Id*. We further explained that because the weighing of evidence in aggravation and mitigation "is a weighing process for the trier of fact, which has the superior opportunity to assess firsthand the credibility and believability of the witnesses on the stand, we will not lightly overturn the trier of fact's decision." *Id.* at 35. However, we also noted that "we will conduct our own thorough and careful review, considering the circumstances of the crimes and the character of the defendant to determine whether the death penalty is appropriate." *Id.* at 36.

We acknowledge defendant's assertion that the review he seeks of the court's determination that the evidence did not support the extreme mental or emotional disturbance mitigating factor is qualitatively different from the review this court performs of the ultimate sentencing determination. We also acknowledge that *Thompson* concerned the latter of these reviews rather than the former. However, we believe that the above-quoted holdings in *Thompson* apply equally to the review defendant seeks. As we stated in *Thompson*, the trial court "has the superior opportunity to assess

firsthand the credibility and believability of the witnesses on the stand"; this applies with equal force to the court's evaluation of whether defendant was under the influence of an extreme mental or emotional disturbance. Thus, as we stated in *Brownell*, we will not lightly overturn the trial court's findings. However, given the gravity of a capital case, we also "make a separate evaluation of the record." *Brownell*, 79 Ill. 2d at 539-40. With respect to defendant's alternative argument that the court found the evidence sufficient but erroneously rejected it anyway, we believe the same standard of review should apply. We note that defendant's arguments both challenge the court's ultimate conclusion with respect to defendant's mental or emotional disorders, which was simply, "I do not believe that they were so extreme. I do not believe that they were an extreme mental or emotional disturbance." Regardless of why the court found that defendant was not under the influence of an "extreme mental or emotional disturbance," defendant asks this court to find that, contrary to the determination of the circuit court, defendant's evidence established the statutory mitigating factor. We will therefore apply the review discussed in *Thompson* to both theories. Having established the standard of review, we may now turn to the substance of defendant's arguments.

Section 9–1(c) of the death penalty statute provides that the trier of fact shall consider any aggravating and mitigating factors relevant to the imposition of the death penalty. 720 ILCS 5/9–1(c) (West 2004). Among the enumerated statutory mitigating factors is that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." 720 ILCS 5/9–1(c)(2) (West 2004). "A defendant is under the influence of an extreme emotional disturbance when the defendant's emotional state at the time of the murder is at such a fragile point as to leave him or her with little to no emotional control." *People v. Easley*, 192 Ill. 2d 307, 339 (2000); *People v. Phillips*, 127 Ill. 2d 499, 534 (1989). Evidence that defendant suffers from a psychological disorder does not necessarily establish an extreme mental or emotional disturbance. See *Thompson*, 222 Ill. 2d at 42-43 ("This court has repeatedly held that evidence of a defendant's mental or psychological impairments may not be inherently mitigating ***."); *People v. Ballard*, 206 Ill. 2d 151, 190

-63-

(2002).

In this case, defendant argues that the court erroneously rejected the mitigating factor because "[n]o expert testified that Mr. Baez did not suffer from extreme mental or emotional disturbance." Because Dr. Heinrich's testimony that defendant *was* suffering from an extreme mental or emotional disturbance on the date of the murders was "unrebutted," defendant argues that it was error for the court to find otherwise. We disagree.

Initially, we note that "the statutory phrase 'extreme mental or emotional disturbance' is neither a standard psychiatric diagnosis nor a legal term of art." *People v. Ramsey*, No. 105942, slip op. at 71 (Oct. 7, 2010). It is, like other mitigating factors, a matter for the trier of fact. Thus, expert testimony is not required to establish that a defendant was under the influence of an extreme mental or emotional disturbance. *Id*. Conversely, expert testimony does not necessarily establish the factor; even where the testimony of an expert in mitigation is unrebutted, the credibility and weight given to the testimony is determined by the trier of fact. *People v. Oaks*, 169 Ill. 2d 409, 467 (1996), *overruled on other grounds by In re G.O.*, 191 Ill. 2d 37 (2000); *People v. Boclair*, 129 Ill. 2d 458, 493 (1989).

Dr. Heinrich testified that defendant suffered from personality disorder not otherwise specified, or "mixed" personality disorder. Heinrich explained that his diagnosis was based on his assessment that defendant showed symptoms of avoidant, antisocial, sadistic, and negativistic personality disorders, but Heinrich did not explain what symptoms defendant displayed. According to Heinrich, because personality disorders are pervasive and inflexible, defendant would have been influenced by his disorder at the time of the murders. He also agreed with defense counsel's question that defendant was "suffering from an extreme mental or emotional disturbance" at the time. Heinrich steadfastly maintained that defendant did not suffer from antisocial personality disorder, despite conceding on cross-examination that defendant met "each and every one" of the diagnostic criteria for that disorder. He further opined, referring to the findings of other professionals that defendant suffered from both personality disorder not otherwise specified and antisocial personality disorder, "if you have this personality disorder not otherwise specified you don't have another personality disorder."

-64-

Defendant's second expert witness, Dr. Coleman, testified that defendant did suffer from both personality disorder not otherwise specified and antisocial personality disorder. Like Heinrich, she opined that a personality disorder would probably have affected defendant on the day of the murders. Coleman also opined that defendant's symptoms were "severe enough to constitute emotional or mental disturbance." She did not, however, opine that defendant's symptoms constituted an *extreme* emotional or mental disturbance, and she conceded on cross-examination that she could not state conclusively that defendant suffered from an emotional or mental disturbance in 1999. Thus, only Heinrich testified that defendant's personality disorders constituted an extreme mental or emotional disturbance.

Coleman also diagnosed defendant with psychotic disorder, but she noted that her diagnosis was "provisional" and could not be definitively confirmed. In making her diagnosis, Coleman relied on defendant's self-reported hallucinations of Janet Mena. She explained on cross-examination that she believed defendant's first symptoms manifested while he was in prison. Coleman acknowledged that no other professional who examined defendant, including Heinrich, had diagnosed a psychotic disorder.

In spite of Heinrich's opinion that defendant was suffering from an extreme mental or emotional disturbance, defendant's own statement undermines his claim that his emotional state at the time of the murders was "at such a fragile point as to leave him or her with little to no emotional control." Defendant points to his statement that he was in a "rage" when he killed Juan Estrada. However, we note that almost immediately after lashing out against Estrada, defendant became concerned that the gun he had used to shoot Estrada was "making too much noise." Contrary to his assertion that he lacked emotional control, defendant explained to officers that he "chose" to kill Estrada because he believed that, if Estrada lived, Estrada would have defendant killed for shooting him. While defendant's initial shots may have been fired in a fit of rage, defendant's rational thought process as he decided that Estrada had to die shows that he was not overwhelmed by his emotions. Defendant's murder of Mena further demonstrates his emotional control. After Estrada was dead, defendant went down to the car where Mena was waiting. He

deliberately lured Mena up to his apartment to kill her because "she would be a witness to the last known place" of Estrada. Defendant went to some lengths to deceive Mena, cleaning himself up to make himself "presentable" before he went to get her and closing the door in his apartment so that she would not see Estrada's body on the floor.

Defendant's actions after he attacked Mena also show his emotional control. Defendant moved the victims to the bathtub to make cleaning up easier on himself. When he decided to stab Mena in the "brain stem," he first placed her head in the toilet so that her blood would drain away. Similarly, defendant's decision to dismember the victims so that he could get rid of their bodies was calculated and deliberate. The process of carrying out his decision required him to change weapons at least twice, from the sword to the hacksaw and then to the electric saw. He then made several trips out of his apartment to dispose of the bodies and the other items. He threw away anything that might connect him to the crimes except his swords, because he feared that their disappearance would be noticed. The careful steps defendant took to avoid detection during and after the murders belies his claim that he had "little or no emotional control." In light of these facts, we find that the record amply supports the court's finding that defendant's diagnoses did not constitute an extreme mental or emotional disturbance.

Defendant also contends that the court misunderstood Heinrich's testimony. While ruling on defendant's motion to reduce sentence, the circuit court found "Doctor Heinrich's testimony was not credible. He was just not a credible witness." In support of this conclusion, the court cited his refusal to diagnose defendant with antisocial personality disorder. The court also noted, "He stated under axis II, you could not have two diagnoses. Doctor Coleman said you could. And, of course, in the report from Doctor Henry, he had two, and I believe some other records indicate more than one diagnosis under axis II." Defendant argues that this statement misinterpreted Heinrich's testimony. According to defendant, Heinrich meant only that a second personality disorder should not be diagnosed in addition to personality disorder not otherwise specified; defendant argues that the court's interpretation was "an overstatement and a misstatement." Even if the court misinterpreted Heinrich on this point, however, we believe that the record amply supports the court's conclusion that

defendant was not under the influence of an extreme mental or emotional disturbance during the murders for the reasons discussed above.

Defendant also argues that the court improperly rejected Dr. Coleman's provisional diagnosis of psychotic disorder when it considered whether defendant was under the influence of an extreme mental or emotional disturbance. We disagree. In making her diagnosis, Coleman relied exclusively on defendant's self-reported hallucinations while in jail. She acknowledged that defendant never showed any signs of psychosis while she interviewed him, although she pointed out that defendant was taking prescribed antipsychotic medication during their visit. Dr. Heinrich did not diagnose defendant with a psychotic disorder, and Coleman herself could make only a "provisional" diagnosis. Even if Coleman's provisional diagnosis was correct, however, she testified that she believed defendant's psychosis first "manifested" only after his arrest. Thus, her testimony provides no direct support for the contention that defendant was under the influence of an extreme mental or emotional disturbance at the time of the murders. Defendant maintains that a diagnosis of psychosis while in jail after the murders could be indicative of a "near psychotic" episode during the murders, noting that one of defendant's juvenile clinical records described his emotion outbursts as "near psychotic." No testimony or evidence supports this assertion. Indeed, as we have explained, defendant's calculating and rational behavior during the murders of Estrada and Mena suggests he was not "near psychotic." We therefore find that the record amply supports the court's conclusion that defendant did not suffer from a psychotic disorder at the time of the murders.

IV. Sentencing Standard

Defendant next argues that the circuit court violated his constitutional rights by applying the "wrong standard" to the sentencing determination. When it announced its determination, the court stated, "There are no mitigating factors sufficient to preclude the imposition of the death penalty." The court's decision mirrored the language of the death penalty statute as it existed prior to November 2003. At that time, the statute directed that if a sentencing court found one or more aggravating factors, "the Court shall consider

any aggravating and mitigating factors \*\*\*. If the Court determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the Court shall sentence the defendant to death." 720 ILCS 5/9–1(h) (West 2002). However, the statute was changed in 2003, and it now directs: "the Court shall consider any aggravating and mitigating factors \*\*\*. If the Court determines, after weighing the factors in aggravation and mitigation, that death is the appropriate sentence, the Court shall sentence the defendant to death." 720 ILCS 5/9–1(h) (West 2004). The change in the sentencing statute was effective November 19, 2003; defendant's sentencing hearing began September 3, 2003, and defendant was sentenced March 9, 2004.

Defendant raised this claim in his posttrial motions. The circuit court acknowledged that the statute had changed and that it had not said that death was the appropriate sentence during its imposition of sentence. The court explained:

> "When I wrote my notes on the yellow sheet of paper, I had both standards because Mr. Baez I thought had the right to elect both, and I certainly thought I said that death was the appropriate sentence. Those words I do not see in the transcript, even though I read it quickly. I certainly didn't see them. But it is clear that under either standard, death is the appropriate sentence.
>
> There were mitigating factors, but there were no mitigating factors sufficient to preclude the imposition of death. And, therefore, death in this Court's opinion was the appropriate sentence in the case."

Later, the court added:

> "I wouldn't have used the wrong standard, but I've indicated that I had the benefit of both standards, and I think that they go hand in hand. If there were mitigating factors sufficient to preclude the imposition of death, then of course death would not be the appropriate sentence. Because there are no mitigating factors sufficient to preclude the imposition of death, then death is in fact without a doubt in my mind the appropriate sentence."

Thus, contrary to defendant's argument, it is clear that the court

did apply the "death is the appropriate sentence" standard in sentencing defendant. Defendant takes issue with the court's equation of the two standards, but we have held that "the new standard is really nothing more than a refined codification of the balancing process sentencing authorities already used in determining whether the death penalty should be imposed." *People v. Mertz*, 218 Ill. 2d 1, 93 (2005). Moreover, irrespective of its discussion of the previous sentencing statute, the court explicitly noted in the posttrial hearing: "death is in fact without a doubt in my mind the appropriate sentence."

Defendant argues, however, that we should not consider the court's comments at the posttrial hearing. According to defendant, the court is "bound" by its statements while imposing sentence, and considering the court's subsequent comments is tantamount to "impeaching the verdict." See, *e.g.*, *People v. Hobley*, 182 Ill. 2d 404, 457 (1998) ("It is well settled that a statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach the jury's verdict."). Defendant misunderstands the purpose of a posttrial motion.

To preserve a claim of error for appeal, a defendant must object at trial and include the claim in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to include a claim in the posttrial motion results in forfeiture of that claim. *Id.* This rule applies with equal force to claims of error at sentencing; all such claims must be included in a postsentencing motion, which is the "functional equivalent" of a posttrial motion for the purpose of preserving issues for appeal. *People v. Reed*, 177 Ill. 2d 389, 394 (1997). As this court has explained:

> "Requiring a written post-sentencing motion will allow the trial court the opportunity to review a defendant's contention of sentencing error and save the delay and expense inherent in appeal if they are meritorious. Such a motion also focuses the attention of the trial court upon a defendant's alleged errors and gives the appellate court the benefit of the trial court's reasoned judgment on those issues." *Id.*

Thus, comments by the trial court at a postsentencing hearing that shed light on claims of errors raised by the defendant are permissible; in fact, they are encouraged, to "give[ ] the appellate court the benefit

of the trial court's reasoned judgment on those issues." *Id.* We therefore reject defendant's arguments that the court's postsentencing explanation of its sentencing rationale is "inadmissible" or equivalent to "impeaching the verdict."

Based on the court's explanation, we find that it applied the correct statutory standard in finding that death was the appropriate sentence in this case.

## V. Constitutional Challenges

Defendant argues that the Illinois death penalty statute violates the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 482-83 (2000), because the prosecution is not required to prove beyond a reasonable doubt that death is the appropriate sentence. We have consistently rejected this argument. *E.g.*, *People v. Runge*, 234 Ill. 2d 68, 150 (2009); *People v. Bannister*, 232 Ill. 2d 52, 92 (2008); *People v. Harris*, 225 Ill. 2d 1, 50 (2007). Defendant has not persuaded us to reconsider our precedents, and we hold again that the Illinois death penalty statute does not violate the Constitution of the United States or of Illinois.

## VI. Excessive Sentence

Finally, defendant argues that the death penalty is excessive because his crime "was triggered by fear of a gangster drug-dealer and mitigated by his family's exposure (and thus his own) to the illegal drug trade, and his own use of illegal drugs from an early age." The State responds that death is the appropriate sentence, considering "the sheer brutality" of the murders and defendant's "violent and belligerent conduct in prison." The State also urges us to consider "defendant's extensive lack of remorse and his repeated failure to take advantage of opportunities for rehabilitation."

The applicable statute provides that this court "may overturn" a death sentence, without respect to any procedural ground for reversal or trial error, if we find that the death sentence is "fundamentally unjust as applied to the particular case." 720 ILCS 5/9–1(I) (West 2008). Thus, "[w]hen requested to do so, this court reviews the evidence in a capital sentencing hearing to determine whether death is the appropriate penalty, even in the absence of trial error." *People v. Thompson*, 222 Ill. 2d 1, 36 (2006). As noted above, because the

second phase of a death penalty hearing is a process of evidentiary balancing, which requires the trier of fact to assess the credibility of the witnesses, we will not lightly overturn the trier of fact's decision. *Id.* at 35. However, we will conduct a "thorough and careful review, considering the circumstances of the crimes and the character of the defendant to determine whether the death penalty is appropriate." *Id.* at 36. Our goal is to "ensure that only those deserving of the ultimate penalty are so sentenced." *Id.* at 35.

Under the statute, the court is instructed to consider "any aggravating and any mitigating factors which are relevant to the imposition of the death penalty." 720 ILCS 5/9–1(c) (West 2008). The statute lists several such aggravating and mitigating factors, but it directs that aggravating and mitigating factors are not limited to those included in the statute. 720 ILCS 5/9–1(c) (West 2008). We have already detailed the evidence in aggravation and mitigation above, but we will review it here and repeat it where necessary.

Defendant first notes that he was introduced to drugs at a young age by his father. The circuit court found that defendant's father introduced him to drugs between the ages of four and six, and that this was a mitigating factor. We agree.

Teodoro Rosas, defendant's father, also instilled in defendant what the circuit court called "some bizarre feelings or thoughts" when he told defendant that he had sold defendant's soul to the devil. Rosas also abused defendant and his mother; Delores's sisters Kathy and Nancy recalled in their written statements that defendant's father inflicted serious injuries on defendant and his mother, requiring medical attention, on more than one occasion. However, Rosas was imprisoned when defendant was just seven years old, and defendant had no further contact with him until after the murders.

Defendant's mother then became involved with Victor Pasarro. Pasarro was also abusive, hitting and slapping defendant to punish him. Pasarro also locked defendant in his room for much of one summer when defendant received a bad report card, and he once kidnapped defendant and his family from their home in Michigan. However, we agree with the circuit court that defendant's brother Genarro Rosas exaggerated the severity of Pasarro's abuse when he testified. Neither defendant nor any of his other relatives ever reported the same severity of abuse Genarro claimed, and nobody

corroborated Genarro's claim that defendant was punished by being forced to kneel on bottlecaps. Moreover, Genarro's claim that Pasarro and his mother did not participate in attempts to counsel and rehabilitate defendant is contradicted by the record. Defendant's juvenile records show that Delores and Pasarro frequently attended counseling sessions and court appearances, although the record does suggest that one or both of them failed to show on a few occasions. Defendant's juvenile probation officer even reported that defendant's mother was "truly interested in the well-being of her son" and had "gone to extremes" to assist the officer.

By the age of 13, defendant had begun to run away. Although he lived for some time with his aunt, Kathy Baez, defendant ran away from Kathy's home after she threatened to take him back to live with Delores and Pasarro. A psychologist who interviewed defendant in 1990 at age 14 noted that defendant reported he had been living on the street for a year. Around the same time, defendant began to break into auto shops. Although Genarro Rosas testified that defendant was simply looking for a place to sleep, we agree with the circuit court that his explanation strains credibility. Instead, defendant's repeated acts of breaking into auto shops and vehicles shows a sustained lack of respect for the property of others.

Psychological and social reports indicate that defendant's legal problems early in life were almost entirely drug related. Between the ages of 13 and 16, the State of Michigan made numerous attempts to provide defendant with rehabilitation programs and treatment for his substance abuse. However, defendant rebuffed these attempts to help him, displaying hostile and violent behavior toward staff and patients at two facilities and running away from another. Defendant's substance abuse continued until the murders in this case, and defendant urges that his "drug-dependence" is a mitigating factor or explanation of the murders. We disagree. Nothing in defendant's statements to police indicate that defendant was under the influence of drugs when he committed these murders. To the extent that defendant blames his history with drugs, while we have already noted the mitigating effect of his early introduction to substance abuse, we do not believe defendant's continuing substance abuse can be viewed as mitigating in light of his own rejection of treatment attempts.

As defendant grew older, his behavior escalated. In 1993,

defendant participated in an aggravated assault along with four other individuals. Later that year, defendant was arrested for possession of cocaine and transferred to the criminal court. In 1996, defendant was incarcerated in Illinois for twice robbing the Dunkin Donuts where he had been employed. In the first robbery, defendant stole money from a locked office. In the second robbery, defendant returned with an accomplice and a gun, threatening store employees and customers. In our view, these robberies demonstrate defendant's continuing lack of respect for the property of others, and the second robbery in particular shows that defendant was willing to threaten serious violence to benefit himself.

Despite this escalation, the brutality of the murders in this case is shocking. Defendant first shot, then stabbed, sliced, and dismembered Juan Estrada. According to defendant, Estrada was alive and asking defendant why he was being killed even as defendant struck him with the sword so many times that defendant lost count of the blows. When Estrada was dead, defendant cleaned himself up and lured Janet Mena to the apartment, where he strangled her while she prayed. When that failed to kill her, defendant kicked her neck. He then dragged her into the bathroom, where she began to call out for Estrada, and stabbed her with the sword. Then he placed her head in the toilet while he stabbed her in the neck. To make cleaning up her blood easier, defendant flushed the toilet as he was stabbing her. Once he was sure Estrada and Mena were dead, defendant mutilated and dismembered their bodies. We find that the heinous brutality defendant displayed in these murders is an aggravating factor.

Defendant claims that he acted out of fear of Estrada and Estrada's gang. He argues that he "panicked" after Estrada began yelling, calling defendant names, and making hostile body movements. We find defendant's claim that he acted out of fear not credible, however, because it is contradicted by defendant's own statements and actions. When defendant gave his videotaped statement, he explained the shooting of Estrada: "At first I tried to negotiate with him and then when I felt negotiation was not possible, I reacted in a truly hostile manner and retrieved a small revolver, small caliber revolver from my waistband and shot Juan Estrada a couple of times." Thus, although defendant did claim that he felt "threatened" by Estrada's "hostile" demeanor, defendant acted out of

his own hostility rather than any fear of Estrada. Defendant also acknowledged that Estrada never displayed any type of weapon. Defendant described his actions as "a fit of rage," not a reaction borne of any kind of fear. Defendant also related telling Estrada that he was killing Estrada because Estrada was trying to "turn some members" of their "organization" against defendant. In fact, the only fear defendant related in describing the incident was his "paranoia" that someone would hear the gunshots. Moreover, we note that fear of Estrada cannot justify or mitigate the murder of Janet Mena. Defendant argues that he killed Mena "because he was afraid she would lead others to where she had last seen Estrada." This kind of fear–the fear of being caught–does nothing to justify or mitigate the cruel and brutal way in which defendant murdered Mena.

Defendant's behavior after his arrest is also troubling. Although defendant asserts that "[p]rison makes the world safe from Teodoro Baez," his conduct while in custody demonstrates otherwise. While in custody on these charges, defendant fashioned a knife and stabbed another inmate in the neck. He also participated in an assault on a corrections officer, striking the officer multiple times in the back of the head. As we have noted, a defendant arrested for a capital crime has "every incentive to behave flawlessly while incarcerated." *Thompson*, 222 Ill. 2d at 44. Defendant's conduct in prison indicates that, despite his assurances, he remains a serious threat to those around him.

Finally, as the circuit court noted, defendant has demonstrated little or no remorse for these crimes. Two of defendant's clinical evaluators reported that defendant expressed remorse for the murder of Mena, but in his videotaped statement he matter-of-factly described how he "cunningly" closed the door in his apartment to prevent her from seeing Estrada's body on the floor. Defendant never expressed remorse for Estrada's murder. In court, defendant again declined to express remorse, instead telling the court, "I did what I felt I had to do."

Defendant coldly and brutally murdered two persons who had done nothing to him. Although he claims he acted out of fear, his claim is belied by his own words. Instead, the record shows that defendant's actions were a shocking extension of his increasingly violent criminal history. While we find that defendant's abusive

childhood and early introduction to drugs are mitigating indications of his troubled past, defendant rejected multiple attempts to provide him with the help he needed to overcome that past. Defendant's actions after his arrest in this case further demonstrate that even life in prison cannot protect society from defendant. After careful consideration of the circumstances of the murders in this case and the character of defendant, we conclude that the death penalty is the appropriate penalty in this case and that its imposition was not excessive.

We note that defendant also reasserts his argument that his psychological history is a mitigating factor. As we have already explained in detail, we agree with the court's finding that defendant was not under the influence of an extreme mental or emotional disturbance when he committed these murders. We further agree that defendant was not suffering from a psychotic disorder. Based on the testimony and reports of Drs. Coleman, Henry, and Heinrich, we also agree with the court's finding that defendant suffered from antisocial personality disorder and personality disorder not otherwise specified. Of course, evidence of a defendant's mental or psychological impairments is not inherently mitigating. *Thompson*, 222 Ill. 2d at 42-43 (collecting cases). Even if we found that defendant's personality disorder was mitigating, we would nonetheless conclude that, in light of the aggravating factors, death is the appropriate sentence.

Defendant compares his case to *People v. Blackwell*, 171 Ill. 2d 338 (1996). In that case, the defendant's brother had been killed by the Latin Kings gang. While visiting in Joliet, the defendant was introduced to several individuals, including Steve Scott. The defendant accompanied Scott and others to a party, but the defendant did not know that four members of the Latin Kings were already at the party. The four Latin Kings members recognized Scott, and accused him of being a member of a rival gang. Scott insisted that he was no longer a member of the rival gang, but the four Latin Kings members cornered him and began fighting with him. Scott was able to escape, but the four gang members followed him to the door. The defendant then pulled out a semiautomatic pistol and fired a shot at the four men. When they turned toward him, he fired several more shots into the group, killing three of the men and wounding two other persons. This court reduced the defendant's death sentence to life in

prison, noting the defendant's lack of prior violence, his lack of criminal history, the unplanned nature of the crime, and the isolated nature of the incident.

*Blackwell* is distinguishable from the present case. Unlike Blackwell, defendant has a long history of criminal behavior, including multiple violent offenses. Although the murder of Juan Estrada may have begun as an unplanned shooting, defendant stated that he "chose" to kill Estrada. He then lured Mena to his apartment before killing her. Unlike the shooting in *Blackwell*, the murders in this case did not occur in the case of a single, isolated explosion of emotion. Instead, defendant's conduct was a prolonged series of brutal acts and two slow and deliberate murders. Defendant has also shown that his capacity for violence is not isolated to the murders in this case by committing further acts of violence while incarcerated. We therefore reject defendant's comparison to *Blackwell*, and we find that death is the appropriate sentence in this case.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. We direct the clerk of this court to enter an order setting Tuesday, September 13, 2011, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

Affirmed.

JUSTICE THEIS took no part in the consideration or decision of this case.